SLR:RKH:KMA; 2018V00809

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

TY CLEVENGER,

                           Plaintiff,                       Civil Action No. 18-CV-1568

     -against –

                                                       (Bloom, M.J.)

U.S. DEPARTMENT OF JUSTICE,
FEDERAL BUREAU OF INVESTIGATION,
and NATIONAL SECURITY AGENCY,

                           Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**DEFENDANTS' STATEMENT
PURSUANT TO LOCAL CIVIL RULE 56.1**

Pursuant to Local Civil Rule 56.1(a) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, Defendants, U.S. Department of Justice ("DOJ"), Federal Bureau of Investigation ("FBI"), and National Security Agency ("NSA"), set forth this statement of material facts as to which there is no genuine issue to be tried with respect to the claims remaining at issue in this action pursuant to the Freedom of Information Act ("FOIA"), which was filed on March 14, 2018:[1]

---

[1] Defendants' pre-motion conference request letter dated January 22, 2019 (Dkt. #21) identified the responses that Plaintiff is still challenging.

## The March 7, 2017 Request to DOJ

1.  In a letter to multiple DOJ components dated March 7, 2016 (*sic*) Plaintiff requested pursuant to the FOIA, *inter alia*, all documents and correspondence exchanged between any DOJ component and attorney Beth Wilkinson or any other attorney or agent working with her regarding Cheryl Mills and Heather Samuelson other than the letters dated June 10, 2016 from Wilkinson to DOJ described in an attached letter (letter dated October 5, 2016, to Attorney General Loretta E. Lynch from the Chairmen of four Committees of the United States Congress). Declaration of Gail Brodfeuhrer dated May 6, 2019 ("Brodfeuhrer Decl.") ¶ 7 and Ex. A; Second Declaration of David M. Hardy dated July 29, 2019 ("Second Hardy Decl.") ¶ 6 and Ex. A; *see* First Amended Complaint ("FAC") ¶ 7 (Dkt. #9); Answer to First Amended Complaint ("Answer") ¶ 7 (Dkt. #13).

## The DOJ Criminal Division's Response

2.  The DOJ Criminal Division acknowledged receipt of Plaintiff's FOIA request (CRM-300588018) by letter dated March 29, 2017. Brodfeuhrer Decl. ¶ 8 and Ex. B.

3.  After Plaintiff agreed to accept the records that the DOJ Criminal Division located during searches for records responsive to similar but broader FOIA requests from other requesters, the DOJ Criminal Division sent its final response to Plaintiff in a letter dated October 11, 2018. Brodfeuhrer Decl. ¶ 11 and Ex. C; *see* Brodfeuhrer Decl. ¶ 10. The DOJ Criminal Division released seven pages of responsive records with certain personal information redacted pursuant to FOIA Exemptions 6 and 7(C), 5 U.S.C. §§ 552(b)(6) and (7)(C). Brodfeuhrer Decl. ¶ 11 and Ex. C.

4.  The DOJ Criminal Division asserted FOIA Exemption 6 and/or 7(C) to protect the following personal information: the email address, telephone and cellphone numbers, and

2

other personal information of Assistant Attorney General Leslie Caldwell; the names and email addresses of DOJ National Security Division ("NSD") attorneys; the name, email address, and telephone number of a DOJ Criminal Division administrative employee; the cellphone number and/or email address of attorneys at a private law firm; and the telephone number of a reporter. Brodfeuhrer Decl. ¶¶ 18-21 and Ex. C.

5. The DOJ Criminal Division concluded that these individuals' privacy rights were more than *de minimus*. Brodfeuhrer Decl. ¶ 18. It identified these potential harms that could result from the release of their personal information: limiting the Government employees' effectiveness in conducting future investigations; exposing the Government employees to annoyance or harassment; subjecting the non-governmental individuals to harassment or embarrassment and undue public attention. Brodfeuhrer Decl. ¶ 20.

6. The DOJ Criminal Division was unable to identify any cognizable public interest in the disclosure of the individuals' redacted personal information that outweighed the individuals' privacy interests. Brodfeuhrer Decl. ¶ 19.

7. The DOJ Criminal Division concluded that release of the redacted information about the government employees and private third parties would constitute a clearly unwarranted invasion of their personal privacy and could reasonably be expected to constitute an unwarranted invasion of their personal privacy. Brodfeuhrer Decl. ¶ 21.

8. The DOJ Criminal Division's October 11, 2018 letter also informed Plaintiff that it had referred another three pages of responsive records that had originated with the DOJ NSD to the NSD for processing and direct response to Plaintiff. Brodfeuhrer Decl. ¶ 12 and Ex. C; *see also* Declaration of Kevin G. Tiernan dated June 7, 2019 ("Tiernan Decl.") ¶ 4.

9. The NSD provided a direct response to Plaintiff by letter dated October 29, 2018. Tiernan Decl. ¶ 5; *see* Tiernan Decl. Ex. B. The NSD released the three pages with portions redacted pursuant to FOIA Exemptions 5, 6, and 7(C), 5 U.S.C. §§ 552(b) (5), (6), and 7(C). Tiernan Decl. ¶ 5 and Ex. B.

10. By letter dated June 7, 2019, the NSD informed Plaintiff that it had determined to release additional information that had previously been redacted. Tiernan Decl. ¶ 6 and Ex. C. The NSD's letter enclosed the three pages (a three-page email chain) with portions redacted pursuant only to FOIA Exemptions 6 and 7(C), 5 U.S.C. §§ 552(b)(6) and 7(C). Tiernan Decl. ¶ 6 and Ex. C.

11. The NSD asserted FOIA Exemptions 6 and 7(C) to protect the names and identifying information of NSD employees. Tiernan Decl. ¶¶ 7-9; *see* Tiernan Decl. Ex. C.

12. The NSD identified the potential harms that could result from the release of the names and identifying information of NSD attorneys, including subjecting them to harassment or intimidation and impairing their ability to continue to conduct government duties effectively in the future, as well as impair the NSD's ability to staff such matters in the future in the best interests of the United States. Tiernan Decl. ¶ 9.

13. The NSD concluded that there was no discernable public interest in identifying the individuals, who are not NSD officials at a level senior enough to have lost a cognizable privacy interest in avoiding publicity or public scrutiny in their work, and that providing their names or identify information would not shed light on the government's law enforcement activities or operations. Tiernan Decl. ¶ 9.

14. The NSD concluded that release of the redacted information would constitute a clearly unwarranted invasion of privacy that outweighs the public interest in disclosure. Tiernan Decl. ¶ 9.

**The FBI's Response**

15. The FBI located ten (10) pages of responsive records, and by letter dated January 12, 2018, released them to Plaintiff with portions redacted pursuant to FOIA Exemptions 6 and 7(C), 5 U.S.C. §§ 552(b)(6) and (7)(C). Second Hardy Decl. ¶ 10 and Ex. E; *see* FAC ¶ 7; Answer ¶ 7.

16. By letter dated July 23, 2019, the FBI provided a supplemental response to this request that included additional segregable portions of information on four of the ten pages. Second Hardy Decl. ¶ 14 and Ex. F at FBI 18-cv-01568 287-296; *see* Second Hardy Decl. Ex. W ("*Vaughn*" index).

17. The FBI asserted FOIA Exemptions 6 and 7(C) to protect personal information, specifically, cellphone numbers, NSD employees' names and email addresses, and a third party's name. Second Hardy Decl. ¶¶ 53-63, Ex. F and Ex. W.

18. The FBI determined that there were cognizable privacy interests connected to the release of the names and identifying information of each of these individuals.  Second Hardy Decl. ¶¶ 58, 62, 63.

19. The FBI identified potential harms that could result from the release of the redacted personal identifying information, including harassment of the FBI employees and the non-FBI government employees, and the negative impacts (harassment, criticism, derogatory inferences, and suspicion) that disclosure of identity could have on the third party. Second Hardy Decl. ¶¶ 58-60, 62, 63.

20. The FBI concluded that there was no public interest to be served by the disclosure of the redacted personal information, which would not significantly increase the public's understanding of the FBI's operations and activities. Second Hardy Decl. ¶¶ 56, 62, 63.

21. The FBI concluded that disclosure of the redacted personal identifying information would result in a clearly unwarranted invasion of privacy that outweighs the public interest in disclosure. Second Hardy Decl. ¶¶ 55, 61, 62, 63.

### The FBI's Response to the September 1, 2017 Request to DOJ

22. In a letter dated September 1, 2017, to multiple DOJ components including the FBI, Plaintiff requested, pursuant to the FOIA, all records and correspondence pertaining to Seth Conrad Rich, who was murdered in the District of Columbia on or about July 10, 2016, including but not limited to any records or correspondence resulting from any investigation of his murder. Declaration of David M. Hardy dated October 3, 2018 ("Hardy Declaration") (Dkt. #16-1) ¶ 5 and Ex. A; *see* FAC ¶ 9; Answer ¶ 9; *see also* Second Hardy Decl. ¶ 15.

23. To locate records responsive to Plaintiff's FOIA request, the FBI Record/Information Dissemination Section ("RIDS") searched the FBI Central Records System ("CRS"). Hardy Decl. ¶¶ 19-21.

24. The FBI Central Records System ("CRS") is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI in the course of fulfilling its integrated missions and functions as a law enforcement, counterterrorism, and intelligence agency. Hardy Decl. ¶ 11; The CRS spans the entire FBI organization and encompasses the records of FBI Headquarters, FBI Field Offices, and FBI Legal Attaché Offices worldwide. Hardy Decl. ¶ 11.

25. The CRS is the principal records system searched by RIDS to locate information

responsive to most FOIA/Privacy Act requests because the CRS is where the FBI indexes information about individuals, organizations, events, and other subjects of investigative interest for future retrieval. Hardy Decl. ¶ 21. The CRS is the FBI recordkeeping system where investigative records responsive to Plaintiff's request are most likely to be found. Hardy Decl. ¶ 25.

26. The Automated Case System ("ACS") has been the FBI's consolidated electronic, integrated case management system since 1995. Hardy Decl. ¶ 15. The Universal Index ("UNI") is the automated index of the CRS that provides all FBI offices with a centralized, electronic means of indexing pertinent investigative information for FBI files for future retrieval via index searching. Hardy Decl. ¶ 16. Individual names may be recorded with applicable identifying information such as date of birth, race, sex, locality, social security number, address, and/or date of an event. Hardy Decl. ¶ 16.

27. Sentinel is the FBI's next-generation case management system that became effective FBI-wide on July 1, 2012. Hardy Decl. ¶ 17. Sentinel includes the same automated applications that are utilized in ACS. Hardy Decl. ¶ 17. When a record is generated in Sentinel, information is indexed for future retrieval. Hardy Decl. ¶ 17. There is an index data sharing nexus between the Sentinel and ACS systems whereby components of information indexed into Sentinel are also replicated or backfilled into ACS. Hardy Decl. ¶ 17.

28. The FBI relies daily on the ACS and Sentinel systems to fulfill essential functions such as conducting criminal, counterterrorism, and national security investigations, background investigations, citizenship and employment queries, and security screening. Hardy Decl. ¶ 15 n.3.

29. The RIDS employs an index search methodology to locate CRS information. Hardy Decl. ¶ 18.

30. To locate records responsive to Plaintiff's FOIA request, the RIDS searched the FBI Central Records System ("CRS") for any main or reference files employing the Universal Index (UNI) application of the Automated Case Support ("ACS") system using a three-way search for "Seth Conrad Rich" (*i.e.*, RIDS searched for: Seth Rich; Rich, Seth; and Seth Conrad Rich). Hardy Decl. ¶ 19 and n.5. These searches did not identify any main or reference file records responsive to Plaintiff's request. Hardy Decl. ¶ 19.

31. The RIDS subsequently conducted additional searches of the CRS via the UNI application of the ACS and a Sentinel index search for both any main and reference file records using the same search terms (three-way search for "Seth Conrad Rich"). Hardy Decl. ¶ 20. No main or reference record was located. Hardy Decl. ¶ 20.

32. The RIDS's searches of the CRS also did not locate any responsive Computer Analysis and Response Team ("CART") records. Hardy Decl. n.6.

33. The RIDS had previously contacted the FBI Washington, D.C. field office on June 21, 2017, in conjunction with another requester's FOIA request for records concerning Seth Conrad Rich's murder. Hardy Decl. ¶ 22; Second Hardy Decl. ¶ 32 n.9. The Field Office advised that it did not open an investigation into Seth Conrad Rich's murder and that the District of Columbia Metropolitan Police Department ("MPD") had declined its offer to assist in their investigation. Hardy Decl. ¶ 22.

34. By letter dated September 19, 2017, the FBI responded to Plaintiff's FOIA request by informing him that no responsive records had been located in a search of the CRS. Hardy Decl. ¶ 6 and Ex. B; *see* FAC ¶ 11; Answer ¶ 11.

8

35. Plaintiff filed an administrative appeal with the Office of Information Policy ("OIP") on September 30, 2017. FAC ¶ 12; Answer ¶ 12; Hardy Decl. ¶ 7 and Ex. C. The OIP affirmed the FBI's determination by letter dated November 9, 2017. FAC ¶ 12; Answer ¶ 12; Hardy Decl. ¶ 9 and Ex. E.

36. After this action was filed, the FBI RIDS again contacted the D.C. Field Office on April 4, 2018. Hardy Decl. ¶ 23; Second Hardy Decl. ¶ 32 n.9. The D.C. Field Office again confirmed that they had not assisted the District of Columbia MPD, provided investigative or technical assistance (including CART assistance), or otherwise opened an FBI investigation into Seth Conrad Rich's murder. Hardy Decl. ¶ 23.

### The October 1, 2017 Requests to the FBI

37. In a letter to the FBI dated October 1, 2017, Plaintiff requested, pursuant to the FOIA, three categories of documents related to a letter that Senator Charles Grassley reportedly sent to FBI Director Christopher Wray on September 25, 2017, concerning a non-disclosure agreement ("NDA") between the FBI and the U.S. Office of Special Counsel ("OSC"). Second Hardy Decl. ¶ 16 and Ex. H; *see* FAC ¶ 13; Answer ¶ 13.

38. The FBI split this request into three requests that it processed separately. Second Hardy Decl. ¶ 19; *see* Second Hardy Decl. Ex. K.

### Request No. NFP-91785

39. The first category of documents identified in Plaintiff's letter was: Since January 1, 2010, all NDAs between the FBI and any other government entity that prohibit the release of information to Congress, any of its agencies or any Freedom of Information Act requestors. Second Hardy Decl. ¶ 16 and Ex. H; *see* FAC ¶ 13; Answer ¶ 13. The FBI assigned this request No. NFP-91785. Second Hardy Decl. ¶ 19 and Ex. K.

40. The FBI responded to Request No. NFP-91785 by letter dated March 13, 2018. Second Hardy Decl. ¶ 22 and Ex. N. The FBI informed Plaintiff that this request was overbroad and vague and lacked sufficient detail for agency personnel to locate records with a reasonable amount of effort as such information is of a type not searchable via the CRS indices. Second Hardy Decl. ¶ 22 and Ex. N. The FBI informed Plaintiff that it was closing this request. searchable via the CRS indices. Second Hardy Decl. ¶ 22 and Ex. N. The FBI also advised Plaintiff that if he resubmitted the request, he should provide more narrowed and detailed information, such as identifying specific records or agreements with specific dates, that would enable FBI personnel to locate any responsive material searchable via the CRS indices. Second Hardy Decl. ¶ 22 and Ex. N.

41. Plaintiff did not resubmit his request; he administratively appealed the FBI's response to the OIP. Second Hardy Decl. ¶ 23 and Ex. O.

**Requests No. 1386556-000 and No. 398016-000**

42. The second category of documents identified in Plaintiff's letter was: All records, documents, correspondence, or other materials sent to Senator Grassley or his representatives in response to his September 25, 2017 letter. Second Hardy Decl. Decl. ¶ 16 and Ex. H; *see* FAC ¶ 13; Answer ¶ 13. The FBI retained the original number assigned Plaintiff's October 1, 2017 letter, No. 1386556-000, for this request. *See* Second Hardy Decl. ¶ 17 and Ex. K.

43. The third category of documents identified in Plaintiff's letter was: All emails, printed correspondence or other records indicating who was involved in drafting the NDA or NDAs referenced in Senator Grassley's September 29, 2017 letter. Second Hardy Decl. ¶ 16 and Ex. H; FAC ¶ 13; Answer ¶ 13. The FBI assigned this request No. 398016-000. Second Hardy Decl. ¶ 19 and Ex. K.

44. By letter dated October 9, 2018, the FBI provided an initial interim response to the second and third categories. Second Hardy Decl. ¶ 27 and Ex. R. The FBI advised Plaintiff that it had reviewed 286 pages of responsive records; it released four (4) of those pages in their entireties to Plaintiff. Second Hardy Decl. ¶ 27 and Ex. R. The FBI further advised Plaintiff that it had referred the other documents, which had originated with other government agencies, to those agencies for consultation. Second Hardy Decl. ¶ 27 and Ex. R; *see* Second Hardy Decl. ¶¶ 78-81.

45. In its second interim response, dated November 9, 2018, the FBI advised Plaintiff that it had reviewed the 50 pages of records responsive to the third category (Request No. 398016-000) (documents indicating who was involved in drafting the NDA referenced in Senator Grassley's letter). Second Hardy Decl. ¶ 28 and Ex. S. In this release, the FBI withheld eight (8) pages in their entireties and released 42 pages (emails and the final signed version of the NDA with the signatures redacted) in full or in part. Second Hardy Decl. ¶ 28 and Ex. S. The FBI withheld documents and information pursuant to FOIA Exemptions 5, 6, 7(C), and 7(E), 5 U.S.C. §§ 552(b)(5), (6), (7)(C), and/or (7)(E). Second Hardy Decl. ¶ 28 and Ex. S.

46. On November 27, 2018, the FBI sent Plaintiff a corrected cover letter for its November 9, 2018 release. Second Hardy Decl. ¶ 29 and Ex. T. The letter stated that it was the final response to Request No. 398016-000. Second Hardy Decl. ¶ 29 and Ex. T.

47. On December 12, 2018, the FBI provided a final response regarding the 232 pages of records responsive to the second category (Request No. 1386556-000) (anything sent to Senator Grassley or his representatives in response to his September 25, 2017 letter to FBI Director Wray). Second Hardy Decl. ¶ 30 and Ex. U. In this release, the FBI withheld two (2) pages in their entireties and released 230 pages to Plaintiff in full or in part. Second Hardy

Decl. ¶ 30 and Ex. U. The FBI withheld documents and information pursuant to FOIA Exemptions 5, 6, 7(A), 7(C), and 7(E), 5 U.S.C. §§ 552(b)(5), (6), (7)(C), and/or (7)(E). Second Hardy Decl. ¶ 30 and Ex. U.

48. By letter dated July 23, 2019, the FBI provided a combined supplemental release for the second (No. 1386556-000) and third (No. 398016-000) categories of requested documents to Plaintiff. Second Hardy Decl. ¶ 31 and Ex. V. The supplemental release comprised additional segregable portions of FBI and Office of Special Counsel ("OSC") information that was previously redacted pursuant to FOIA Exemption 7(A) and 7(E). Second Hardy Decl. ¶ 31 and Ex. V; *see* Second Hardy Decl. ¶ 36 n.10, n.12, n.13.

**Exemption 5**

49. The FBI asserted FOIA Exemption 5 to protect privileged information in the emails relating to the NDA and in the transcripts of the interviews of two FBI employees (attorneys) that were conducted as part of an OSC investigation into allegations that FBI Director James Comey violated the Hatch Act when he made public announcements concerning the FBI's investigation into former Secretary Clinton's use of a personal email server. Second Hardy Decl. ¶¶ 40-48, Ex. V and Ex. W.

50. FOIA Exemption 5 was asserted to protect deliberative process information in the emails exchanged concerning the NDA between the FBI and the Executive Office for United States Attorneys ("EOUSA") Office of the General Counsel ("OGC") concerning the drafting of the NDA. Second Hardy Decl. ¶¶ 41, 75, Ex. V and Ex. W. The disclosure of this material would reveal the ongoing dialogue among and between FBI employees and other Government personnel about preliminary versions of what may later become a final document reflecting an

agency policy or decision, or what may remain in a draft and never mature into a final approved form.  Second Hardy Decl. ¶ 41.

51. FOIA Exemption 5 was asserted by the FBI and the OIP on behalf of the Office of the Deputy Attorney General ("ODAG") to protect deliberative process information in the OSC interview transcripts concerning decision making processes involving the FBI employee who was being interviewed, FBI employees, and ODAG employees. Second Hardy Decl. ¶¶ 42, 71-73, Ex. V and Ex. W. Disclosure of the redacted material would reveal the formulation of opinions, advice, evaluations, deliberations, proposals, or recommendations. Second Hardy Decl. ¶ 42.

52. The deliberative process privilege was asserted in conjunction with FOIA Exemption 5 to protect the deliberative material in the emails and the interview transcripts because disclosure of the information would have an inhibiting effect on agency decision making and the development of policy and would chill full and frank discussions between agency personnel and decision makers regarding a decision. Second Hardy Decl. ¶ 43. Agency personnel would be hesitant to offer their preliminary impressions, opinions or comments if they knew their thoughts of the moment might be made a matter of public record at some future date, and because employees' self-censorship would, in turn, degrade the quality of agency decisions by depriving decision makers of fully explored options developed from robust debate. Second Hardy Decl. ¶ 42.

53. The FBI asserted FOIA Exemption 5 to protect attorney work product (discussions) in the emails and the interview transcripts. Second Hardy Decl. ¶¶ 45-46, Ex. V and Ex. W.

54. The FBI asserted FOIA Exemption 5 to protect privileged attorney-client discussions in the interview transcripts between and among FBI counsel and FBI client employees. Second Hardy Decl. ¶¶ 47-48, Ex. V and Ex. W.

55. FOIA Exemption 5 was also asserted at the request of the EOUSA to protect privileged attorney-client communications in the emails relating to the NDA between the EOUSA OGC and the FBI. Second Hardy Decl. ¶ 75.

**Exemptions 6 and 7(C)**

56. The FBI asserted FOIA Exemptions 6 and 7(c) to protect the names, identifying information, email addresses and personal cellphone numbers of FBI special agents, FBI professional staff, non-FBI government personnel, and third parties contained in the emails concerning the NDA and in the OSC interview transcripts. Second Hardy Decl. ¶¶ 53-63, Ex. V and Ex. W.

57. The FBI determined that there were cognizable privacy interests connected to the release of the redacted names, identifying information, and other personal information of the FBI special agents and FBI professional staff. Second Hardy Decl. ¶ 58. The FBI identified potential harms that could result from the release of their redacted personal information, including becoming the targets of harassing inquiries for unauthorized access to information regarding investigations and having their effectiveness in other investigations seriously prejudiced, being subjected to unofficial questioning about their assistance rendered in matters such as the NDA or the OSC investigation or their conduct in other investigations and/or legal matters regardless of whether they are currently employed by the FBI. Second Hardy Decl. ¶¶ 58-60.

14

58. The FBI determined that there were cognizable privacy interests connected to the release of the names, email addresses, and identifying information of non-FBI Federal Government personnel. Second Hardy Decl. ¶ 62. The FBI identified potential harms that could result from the release of their redacted personal information, including subjecting these individuals to unauthorized inquiries and harassment. Second Hardy Decl. ¶ 62.

59. The FBI determined that there were cognizable privacy interests connected to the release of the names, personal cellphone numbers, and identifying information of third parties mentioned in the investigatory records because they came into contact with subjects of the investigations. Second Hardy Decl. ¶ 63. The FBI identified potential harms that could result from the release of the redacted personal information, including the extremely negative connotation caused by their association with an FBI investigation, which could subject them to possible harassment, criticism, derogatory inferences, and suspicion. Second Hardy Decl. ¶ 63.

60. The FBI concluded that there was no public interest to be served by the disclosure of the redacted personal information for any of the three groups of individuals, which would not significantly increase the public's understanding of the FBI's operations and activities. Second Hardy Decl. ¶¶ 56, 61, 62, 63.

61. The FBI concluded that disclosure of the redacted personal identifying information for any of these individuals would result in a clearly unwarranted invasion of privacy that outweighs the public interest in disclosure. Second Hardy Decl. ¶¶ 61, 62 63.

**Exemptions 7(A) and 7(E)**

62. The FBI asserted FOIA Exemption 7(A) in conjunction with Exemption 7(E) to protect information about law enforcement techniques and procedures for law enforcement investigations or prosecutions. Second Hardy Decl. ¶¶ 49-52, 67-70, Ex. V and Ex. W.

63. The FBI asserted FOIA Exemption 7(E) to protect information in the OSC transcripts about the size of the FBI and the composition of its units and divisions, including the number of personnel. Second Hardy Decl. ¶ 67, Ex. V and Ex. W. If this non-public information were released, criminals or adversaries could use it to deduce the amount of resources the FBI is dedicating to particular areas or types of operations, scout non-public FBI joint locations, gain insight on the FBI's capabilities in a certain region, ascertain where the FBI has a less robust presence, and organize their illicit activities to exploit that information and circumvent the law in subject areas or geographic locations where the FBI has less presence or fewer resources. Second Hardy Decl. ¶ 67.

64. The FBI asserted FOIA Exemption 7(E) to protect information about the focus of a specific FBI investigation. Second Hardy Decl. ¶ 68, Ex. V and Ex. W. Disclosure of this information would reveal the scope of the FBI's programs and strategies it intends to pursue in preventing and disrupting criminal activity, and enable criminals to gauge the FBI's strengths and weaknesses in certain areas, structure their activities to avoid detection and disruption by the FBI, sand circumvent the law. Second Hardy Decl. ¶ 68.

65. The FBI also asserted FOIA Exemption 7(E) to protect law enforcement techniques and procedures that it uses to collect and analyze information in connection with both criminal and national security investigations. Second Hardy Decl. ¶ 69, Ex. V and Ex. W. Although the techniques may be known in a general sense, the technical analysis, including the specifics of

16

how and in what setting they are employed, is not known to the public. Second Hardy Decl. ¶ 69. Disclosure of the information would reveal the identity of methods used in collecting and analyzing information, including how and from where the FBI collects information, as well as the methodologies employed to analyzed it. Second Hardy Decl. ¶ 69. Disclosure of this information would enable subjects of investigations to circumvent similar and currently used techniques, which would facilitate the accumulation of information by investigative subjects about the circumstances under which specific techniques were used or requested to collect certain information, how the information is analyzed, and the usefulness of the information obtained. Hardy Second Decl. ¶ 69. Release of the information would enable criminals and terrorists to educate themselves on techniques employed by the FBI in collecting and analyzing information, thereby allowing them to take countermeasures to circumvent the effectiveness of these techniques. Hardy Second Decl. ¶ 69.

66. The FBI also asserted FOIA Exemption 7(E) to protect sensitive information about investigative methods used by the FBI in conducting both criminal and national security investigations. Second Hardy Decl. ¶ 70. Disclosure of information about these methods and their use would highlight the types of activities, facts, or occurrences that are of particular interest to the FBI in these investigations, and disclosure of investigative methods, analysis of information gleaned from the methods or any other sort of details would reveal the kinds of information the FBI is interested in capturing. Second Hardy Decl. ¶ 70. As a result, individuals would have the opportunity to employ countermeasures to circumvent detection or alter behavior. Second Hardy Decl. ¶ 70.

## The October 10, 2017 Requests to the NSA

67. In a letter dated October 10, 2017, addressed to the NSA and two other agencies, Plaintiff requested pursuant to the FOIA, all documents, records, and correspondence since January 1, 2016 from the NSA concerning four categories of subjects or individuals. Declaration of Steven E. Thompson dated June 14, 2019 ("Thompson Decl.") ¶ 11 and Ex. A; *see* FAC ¶ 14; Answer ¶ 14.

68. The first category of documents identified in Plaintiff's letter was: All documents, records, or communications between Seth Rich and any of the following: Julian Assange, Wikileaks, Kim Dotcom, Aaron Rich, Shawn Lucas, Kelsey Mulka, Imran Awan, Abid Awan, Jamal Awan, Hina Alvi, Rao Abbas, and/or any person or entity outside of the United States. Thompson Decl. ¶ 11 and Ex. A.

69. The second category of documents identified in Plaintiff's letter was: All documents or records (including audio recordings) of phone calls made or received by Seth Rich on July 9, 2016 and on July 10, 2016. Thompson Decl. ¶ 11 and Ex. A.

70. The third category of documents identified in Plaintiff's letter was: All documents, records, or communications referencing or containing financial transactions between Seth Rich and any of the following: Julian Assange, Wikileaks, Kim Dotcom, Aaron Rich, Shawn Lucas, Kelsey Mulka, Imran Awan, Abid Awan, Jamal Awan, Hina Alvi, Rao Abbas, and/or any person or entity outside of the United States. Thompson Decl. ¶ 11 and Ex. A.

71. The fourth category of documents identified in Plaintiff's letter was: All correspondence received from or sent to any member of Congress (or anyone representing a member of Congress or Congressional committee) regarding Seth Rich, Julian Assange,

18

Wikileaks, Kim Dotcom, Aaron Rich, Shawn Lucas, Kelsey Mulka, Imran Awan, Abid Awan, Jamal Awan, Hina Alvi, and/or Rao Abbas. Thompson Decl. ¶ 11 and Ex. A.

72. The NSA has two primary missions: (1) to collect, process, analyze, produce, and disseminate signals intelligence ("SIGINT") information for foreign intelligence and counterintelligence purposes to provide support for national and departmental requirements and for the conducting of military operations; and (2) to conduct information assurance (cybersecurity) activities. Thompson Decl. ¶ 5.

73. In performing its first mission (the SIGINT mission), the NSA exploits foreign signals to obtain intelligence necessary to the national defense, national security, and/or the conduct of foreign affairs. Thompson Decl. ¶ 6. SIGINT information provided to senior Government officials, intelligence agencies, and/or the military in a classified setting is relevant to a wide range of issues including, but not limited to, military order of battle, threat warnings and readiness, arms proliferation, terrorism, and foreign aspects of international narcotics trafficking. Thompson Decl. ¶ 7.

74. The NSA's ability to produce SIGINT depends on its access to foreign signals, and public disclosure of either the capability to collect specific signals or the substance of the SIGINT information can easily alert foreign adversaries to the vulnerabilities of their signals. Thompson Decl. ¶ 8. SIGINT capabilities are both expensive and fragile. Thompson Decl. ¶ 8.

75. Communications intelligence ("COMINT") is a subset of SIGINT information obtained from intercepted foreign communications. Thompson Decl. ¶ 9. A fundamental tenet of the COMINT process is that the identity of specific communicants whose communications are intercepted (commonly referred to as "targets"), the degree of success in exploiting targets, and the vulnerabilities of particular foreign communications are matters that must be

19

maintained in strictest secrecy because the ability to exploit foreign communications is fragile. Thompson Decl. ¶ 9. Disclosure of any of these matters would encourage countermeasures by the targets of the NSA's COMINT efforts. Thompson Decl. ¶ 9.

76. Disclosure of even a single intercepted communication could potentially reveal the intelligence collection activities applied against targets around the world. Thompson ¶ 9. If adversaries were aware of the NSA's activities and capabilities, they would likely change their communications methods to evade collection, which would undermine the NSA's entire mission. Thompson Decl. ¶¶ 9, 36. COMINT targets could change how they communicate, which could inhibit access to their communications and, consequently, deny the United States access to information crucial to its defense. Thompson Decl. ¶ 9. Such a loss of information would be extremely harmful to the national security of the United States. Thompson Decl. ¶ 9.

77. The NSA provided its response regarding the first three categories in Plaintiff's FOIA request by letter dated November 7, 2017, which stated that the NSA could neither confirm nor deny the existence of responsive records, citing FOIA Exemptions 1 and 3, 5 U.S.C. §§ 552(b)(1) and (3). Thompson Decl. ¶ 12 and Ex. B.  The response informed Plaintiff that Exemption 1 applied because the existence or non-existence of the materials Plaintiff requested is a currently and properly classified matter in accordance with Executive Order 13526. Thompson Decl. Ex. B. The response further informed Plaintiff that Exemption 3 applied because the existence or non-existence of the information was protected from disclosure by statute, specifically 18 U.S.C. § 798, 50 U.S.C. § 3024(i), and 50 U.S.C. § 3605 (Section 6, Public Law 86-36). Thompson Decl. Ex. B.

78. The NSA could not acknowledge the existence or nonexistence of records responsive to the first three categories in Plaintiff's letter because doing so would reveal

whether or not the NSA has engaged in certain, or any, intelligence activities and/or did not target individual communications for collection. Thompson Decl. ¶ 16.

79. The NSA's letter dated November 7, 2017 also advised Plaintiff that he could appeal the decision and provided information about how to appeal. Thompson Decl. Ex. B. Plaintiff did not file an administrative appeal regarding the first three categories of records. Thompson Decl. ¶ 12.

80. With respect to the fourth category of records requested in Plaintiff's letter (agency correspondence with Congress regarding Seth Rich or any of eleven other specifically named individuals or entities), the NSA responded by letter dated October 4, 2018. Thompson Decl. ¶ 15 and Ex. E. In its response, the NSA stated that it had identified fifteen responsive documents and was withholding all of them (total 32 pages) in their entireties pursuant to FOIA Exemptions 1 and 3, 5 U.S.C. §§ 552(b)(1) and (3). Thompson Decl. ¶ 15 and Ex. E; *see* Thompson Decl. ¶ 33.

81. The fifteen responsive documents that the NSA withheld are communications between Congress and the NSA relating to classified intelligence matters and the NSA's mission, core functions and activities, and implicate intelligence sources and methods. Thompson Decl. ¶¶ 35, 39. Many of the documents concern specific topics the very existence of which is classified. Thompson Decl. ¶ 35.

82. The NSA withheld the fifteen documents pursuant to FOIA Exemption 1 because they are properly classified as either TOP SECRET or SECRET in accordance with Section 1.4 of Executive Order 13526 (Classified National Security Information). Thompson Decl. ¶¶ 34-35 and Ex. E. Depending of the classification level, release of the documents would

cause exceptionally grave damage or serious damage to the NSA's mission. Thompson Dec. ¶ 35.

83. The NSA also withheld the fifteen responsive documents pursuant to FOIA Exemption 3 because they are protected by from disclosure by several statutes, specifically, 18 U.S.C. § 798, 50 U.S.C. § 3024(i), and Section 6 of the National Security Act of 1959 (50 U.S.C. § 3605). Thompson Decl. ¶¶ 37-43 and Ex. E.

Dated:  Brooklyn, New York  
      July 29, 2018

RICHARD P. DONOGHUE  
UNITED STATES ATTORNEY  
Eastern District of New York  
Attorney for Defendants  
271-A Cadman Plaza East, 7th Floor  
Brooklyn, New York 11201

By:     *Kathleen A. Mahoney*  
       KATHLEEN A. MAHONEY  
       Assistant U.S. Attorney  
       (718) 254-6026  
       kathleen.mahoney@usdoj.gov

TO:    Ty Clevenger  
      Pro Se Plaintiff  
      P.O. Box 20753  
      Brooklyn, New York  11202-0752