UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
TY CLEVENGER,

                Plaintiff,                      **MEMORANDUM & ORDER**
                                                  **18 CV 1568 (LB)**

     -against-

U.S. DEPARTMENT OF JUSTICE, FEDERAL BUREAU
OF INVESTIGATION, and NATIONAL SECURITY
AGENCY,

                Defendants.
-----------------------------------------------------------------------X
**BLOOM, United States Magistrate Judge:**

      Plaintiff, Ty Clevenger, brings this action *pro se*[1] pursuant to the Freedom of Information

Act ("FOIA"), 5 U.S.C. § 552 against defendants U.S Department of Justice ("DOJ"), the Federal

Bureau of Investigation ("FBI"), and the National Security Agency ("NSA"), challenging

defendants' responses to several FOIA requests he made and alleging that defendants have

improperly withheld responsive records. Defendants now move for summary judgment pursuant

to Rule 56 of the Federal Rules of Civil Procedure,[2] and plaintiff moves for partial summary

judgment. For the following reasons, defendants' motion for summary judgment is granted, and

plaintiff's motion for partial summary judgment is denied.[3]

---

[1] While plaintiff is proceeding *pro se*, plaintiff is an attorney and thus he is not entitled to the liberal reading that *pro se* plaintiffs are generally afforded. Tracy v. Freshwater, 623 F.3d 90, 101–102 (2d Cir. 2010); Bliven v. Hunt, 478 F. Supp. 2d 332, 334 (E.D.N.Y. 2007) (finding experienced attorney not entitled to degree of liberality given to non-attorney *pro se* plaintiffs) (citations omitted); Maloney v. Cuomo, 470 F. Supp. 2d 205, 209 (E.D.N.Y. 2007) ("Although the Court normally will hold the pleadings of a *pro se* plaintiff to a less rigorous standard of review than pleadings drafted by counsel, as an experienced attorney the plaintiff's papers in this case are not entitled to such special consideration") (citing Goel v. United States DOJ, No. 03 Civ. 0579, 2003 WL 22047877, at *1 (S.D.N.Y. Aug. 27, 2003)).

[2] Even though he is an attorney, defendants provided plaintiff with Local Civil Rule 56.2 notice regarding summary judgment. See Decl. of Service, ECF No. 34.

[3] The parties consented to a Magistrate Judge for all purposes. See 28 U.S.C. 636(c); ECF No. 20.

## BACKGROUND AND PROCEDURAL HISOTRY

The facts are derived from defendants' Rule 56.1 statement,[4] as well as from the parties' declarations and exhibits. The facts are considered in the light most favorable to the non-moving party. Plaintiff challenges defendants' responses and redactions to his FOIA requests submitted on March 7, 2017, September 1, 2017, October 1, 2017, and October 10, 2017. See Am. Compl. ¶¶ 7, 9–12, 13, 14. Defendants answered plaintiff's amended complaint on July 11, 2018 and provided plaintiff with their final response to plaintiff's FOIA requests on or around December 12, 2018.[5]

### Plaintiff's March 7, 2017 FOIA Request

Plaintiff's amended complaint alleges that defendants improperly invoked Exemptions to FOIA which protect disclosure of certain documents and information. Plaintiff also challenges the adequacy of defendants' search regarding certain of his requests. Plaintiff's Memorandum of Law addresses only defendants' responses to his September 1, 2017 and October 1, 2017 FOIA requests in order to focus on the "ones of greatest public interest." Pl.'s Mem. of Law at 2. Nevertheless, this Memorandum and Order addresses all of the parties' disputes.

On March 7, 2017, plaintiff submitted a FOIA request to the Department of Justice, identifying six categories of records primarily related to the investigation of Hillary Rodham

---

[4] Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1") requires a party moving for summary judgment to submit "a separate, short and concise statement" of the allegedly undisputed material facts, set out in numbered paragraphs, on which the moving party relies in arguing that there is no genuine issue to be tried. See Local Rule 56.1(a); see also Gianullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003); Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 72 (2d Cir. 2001). Defendants submitted a statement of undisputed facts pursuant to Local Rule 56.1(a); however, plaintiff failed to file a Rule 56.1 counterstatement. The Court may deem the facts in defendants' Rule 56.1 statement admitted, unless specifically controverted by plaintiff's counterstatement. See Local Rule 56.1(c); T.Y. v. New York City Dep't of Ed., 584 F.3d 412, 418 (2d Cir. 2009) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible."). However, the Court may not rely solely on the statement of undisputed facts contained in the Rule 56.1 statement: "[i]t must be satisfied that the citation to the evidence in the record supports the assertion." Vt. Teddy Bear Co., Inc. v. 1–800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004); see Gianullo, 322 F.3d at 143 n.5.
[5] Defendants supplemented their response to plaintiff on July 23, 2019.

Clinton's emails.[6] See Declaration of Gail Brodfuehrer ("Brodfuehrer Decl.") ¶ 7; Brodfuehrer Decl. Ex. B; Am. Compl. ¶ 7. Plaintiff disputes the DOJ's Criminal Division and the FBI's responses to two of the six categories identified in his letter. Specifically, plaintiff disputes defendants' responses to the following requests:

> "All documents and correspondence exchanged between (1) the Department of Justice or any component (including the FBI) and (2) Beth Wilkinson (or any other attorney or agent working with her) regarding Cheryl Mills and Heather Samuelson"

> "All documents and correspondence that were exchanged between (1) the Department of Justice or any component (including the FBI) and (2) Congress (or any of its committees) regarding any investigation [of] Hillary Rodham Clinton's emails or email system. This request includes, but is not limited to, documents and correspondence exchanged between the Department and Congress regarding whether David Kendal, Cheryl Mills, and/or Heather Samuelson mishandled or destroyed Mrs. Clinton's emails."

*The DOJ Criminal Division's Response*

On October 11, 2018, the Criminal Division sent its final response to plaintiff, which notified him that seven pages of records were located and were appropriate for release in part. The Criminal Division advised plaintiff that certain information was protected and thus redacted pursuant to section 5 U.S.C. § 552(b)(6) ("Exemption 6"), which "concerns material the release of which would constitute a clearly unwarranted invasion of the personal privacy of third parties" and 5 U.S.C. § 552 (B)(7)(c) ("Exemption 7(c)"), "which concerns records or information compiled for law enforcement purposes the release of which could reasonably be expected to constitute an unwarranted invasion of the personal privacy of third parties." See Brodfuehrer Decl. Ex. C.

---

[6] The Court notes that the request is dated March 7, 2016; however, plaintiff's amended complaint states that the date is March 7, 2017 and the Criminal Division of DOJ acknowledged receipt of plaintiff's request on March 29, 2017. Brodfuehrer Decl. ¶ 8.

The Criminal Division asserted Exemptions under subsections 6 and 7(c) and withheld the email address, telephone and cell phone numbers and other personal information of Assistant Attorney General Leslie Caldwell; the names and email addresses of attorneys from the National Security Division ("NSD"); the name, email address and telephone number of a Criminal Division administrative employee; the cell phone number of an attorney from a private law firm; and the phone number of a Washington Post reporter. Defs.' 56.1 Statement ¶ 6–7; Brodfeuhrer Decl. ¶ 18. The Criminal Division concluded that these individuals' privacy rights were more than *de minimus*. Id. The Criminal Division did not identify any cognizable public interest in the disclosure of the requested information. Declaration of Kevin T. Tiernan ("Tiernan Decl.") ¶ 19. Regarding individuals' privacy interest, the Criminal Division found that revealing the information would limit DOJ government employees' effectiveness in conducting future investigations and releasing non-government employees' information could subject the individuals to harassment or embarrassment. Id. at ¶ 20; Defs.' 56.1 Statement ¶ 6–7. The Criminal Division subsequently referred three pages of responsive records to the NSD in order to respond to plaintiff. Defs.' 56.1 Statement ¶ 8; Brodfeuhrer Decl. Ex. C.

*The NSD's Response*

On October 29, 2018, the NSD sent its response to plaintiff, informing him that three pages of responsive records would be released in part. Tiernan Decl. Ex. B. The NSD withheld part of a three-page email chain written between June 3–5, 2016 between Beth Wilkinson and various Department attorneys and NSD personnel from the Counterintelligence and Export Control Section pursuant to Exemptions 5, 6, and 7(c). Tiernan Decl. ¶¶ 5, 7. On June 7, 2019, the NSD advised plaintiff that they were issuing additional information and discontinued withholding records pursuant to Exemption 5. However, the NSD continued to withhold portions of the records

pursuant to FOIA Exemptions 6 and 7(c) because the withheld information would constitute an unwarranted invasion of the privacy of NSD personnel. Tiernan Decl. ¶ 6. NSD withheld the name and identifying information of NSD attorneys authoring emails within the chain. Id. at ¶ 9. The NSD found that the attorneys authoring the emails were not senior enough to have lost a cognizable privacy interest in avoiding publicity or public scrutiny. Thus, release of the attorneys' names and identifying information could subject them to harassment or intimidation and disclosure could impair NSD's staffing ability. Id. Additionally, the NSD conducted a line-by-line analysis of responsive records and found that no information could be segregated for release to plaintiff. Id. ¶ 10.

*The FBI's Response*

On January 12, 2018, the FBI made an interim response to plaintiff by producing 10 pages in full or in part, again withholding certain information pursuant to FOIA Exemptions 6 and 7(c). Second Declaration of David M. Hardy ("Second Hardy Decl.") ¶ 10. The FBI issued a supplemental response to plaintiff on July 23, 2019, a bates-numbered and coded version of previously released records as well as additional segregable portions of information. Id. at ¶ 14. The FBI withheld the identifying information, email addresses, and personal cellular telephone numbers of FBI Special Agents and professional staff responsible for receiving, reviewing, analyzing, supervising, conducting and/or maintaining the investigation activities and the day to day operation of the FBI. Defs.' 56.1 Statement ¶ 17; Second Hardy Decl. ¶ 56–61. Additionally, the FBI withheld the names, email addresses, and identifying information of non-FBI federal government personnel and third parties identified in the responsive records. Id. at ¶ 62–63. The FBI stated privacy interests warranted withholding disclosure of this information. FBI employees possess top security clearances; access to classified materials and disclosure of FBI employees'

information would pose a risk of unwarranted invasions of privacy; FBI professional staff have an identifiable privacy interest from unofficial questioning regarding the conduct of investigations; disclosure of non-FBI federal government personnel could subject those individuals to unauthorized inquiries and harassment; and disclosure of third-parties could subject these individuals to harassment, criticism, derogatory inferences and suspicion. Defs.' 56.1 Statement ¶¶ 17–19; Second Hardy Decl. ¶¶ 53–63. The FBI concluded that disclosure of the personal identifying information would result in an unwarranted invasion of the third parties' privacy interests and therefore the privacy interests outweighed the public interest in disclosure. Defs.' 56.1 Statement ¶ 20.

**Plaintiff's September 1, 2017 FOIA Request**

On September 1, 2017, plaintiff submitted a FOIA request to the FBI for "all records and correspondence pertaining to Seth Conrad Rich, who was murdered in the District of Columbia on or about July 10, 2016. This request includes, but is not limited to, any records or correspondence resulting from any investigation of his murder." Declaration of David M. Hardy ("Hardy Decl."), Ex. A. On September 19, 2017, the FBI responded to plaintiff's FOIA request, stating "[b]ased on the information you provided, we conducted a search of the Central Records System. We were unable to identify main file records responsive to FOIA." Hardy Decl. Ex. B. Plaintiff was further advised that he could submit an appeal to the Office of Information Policy ("OIP"), which he did on September 30, 2017, and on November 9, 2017, OIP affirmed the FBI's determination. Hardy Decl. ¶¶ 7, 9.

To respond to plaintiff's FOIA request, defendants state that the Record Information Dissemination Section ("RIDS") conducted an index search of the Central Record System ("CRS") for responsive main and reference files employing the Universal Index ("UNI") application of

Automated Case Support ("ACS").[7] The FBI conducted a three way search using the name "Seth Conrad Rich."[8] Hardy Decl. ¶ 19. No responsive main or reference records were located. Id. at ¶ 20. The FBI also searched its Sentinel index using the same original search, which resulted in no responsive main or record files being located.[9] Hardy Decl. ¶ 20. RIDS conducted the CRS index searches because they encompass information about "individuals, organizations, events and other subjects of investigative interest for future retrieval," and given the nature of plaintiff's request, such records would be reasonably expected to be located in the CRS. Hardy decl. ¶ 21.

On June 21, 2017, prior to plaintiff's appeal, and on April 4, 2018, the FBI contacted the FBI's Washington Field Office ("WFO") and confirmed that the WFO did not open an investigation into the murder of Seth Conrad Rich. Hardy Decl. ¶¶ 22–23. However, the FBI did not search the WFO's email system as plaintiff suggested. The FBI states that they are only required to search locations reasonably calculated to yield responsive records and emails that have investigative significance are placed in the CRS for record keeping. Id. at ¶ 24.

### Plaintiff's October 1, 2017 FOIA Request

Plaintiff submitted a three-part FOIA request to the FBI on October 1, 2017 regarding a letter Senator Charles Grassley sent to FBI Director Christopher Wray concerning a non-disclosure agreement ("NDA") between the FBI and the Office of Special Counsel. Second Hardy Decl. Ex. H. Plaintiff specifically requested (1) Since January 1, 2010, all NDAs between the FBI and any

---

[7] Implemented on October 1, 1995, ACS is an integrated case management system for FBIHQ and all FBI field offices. 105 million CRS records were converted from previously used systems into one, consolidated case management system. Hardy Decl. ¶ 15. UNI is the automated index of the CRS which provides an electronic means of indexing investigative information for future retrieval via index searching. Id. at ¶ 16.

[8] The three-way search breaks a name down into three different combinations. The FBI's three-way search ran the following names, (1) Seth, Conrad; (2) Conrad, Seth; and (3) Seth, Conrad, Rich. Hardy Decl. at 8.

[9] Sentinel is the FBI's next generation case management system that became effective July 1, 2012. Hardy Decl. ¶ 17. This system did not replace ACS, but provides a web based interface for FBI users. Id. After July 1, 2012, all FBI generated records are created using Sentinel, and the records are indexed for future retrieval. Id. ACS and Sentinel have an index sharing nexus, where information indexed into Sentinel is replicated into ACS. Thus, Sentinel builds upon ACS, providing another portal to locate information within CRS for records generated after July 1, 2012.

other government entity that prohibit the release of information to congress, any of its agencies, or any Freedom of Information Act requestors; (2) All records, documents, correspondence, or other materials sent to Senator Grassley or his representatives in response to his September 25, 2017 letter; and (3) All emails, printed correspondence or other records indicating who was involved in drafting the NDA or NDAs referenced in Senator Grassley's September 25, 2017 letter. Id.

On March 13, 2018, the FBI advised plaintiff that part 1 of his request was overbroad, vague, and lacked sufficient detail for agency personnel to locate records. Id. at ¶ 22; Ex. N. The FBI further advised plaintiff that he may submit an appeal with the OIP. Id. On March 14, 2018, plaintiff appealed the FBI's decision concerning the NDAs, stating "[i]t is not possible to suggest that the FBI Office of General Counsel is unable to search for non-disclosure agreements that it executed with other agencies, and it should not matter whether the documents are logged into the "Central Records System." Id. Ex. O.

Regarding parts 2 and 3 of plaintiff's October 1, 2017 request, the FBI made an interim release in response on October 9, 2018. Second Hardy Decl. ¶ 27. For part 3 of plaintiff's request, the FBI reviewed 236 pages; 232 pages were sent to Other Governmental Agencies ("OGA"), and 4 pages were released to plaintiff. For part 2 of plaintiff's request, 50 pages were reviewed and sent to OGAs. Id. The FBI made a second interim release in response on November 9, 2018 regarding part 3 of plaintiff's request. Id. at ¶ 28. The FBI advised plaintiff that 50 pages were reviewed, and 42 pages were released in in full or in part. Id. Certain information was withheld by the FBI and Executive Office for the United States Attorneys ("EOUSA") pursuant to FOIA Exemptions 5, 6, and 7 (E). Id. The FBI then advised plaintiff on November 27, 2018 that its November 9, 2018 release was its final release of records for part 3 of plaintiff's request Id. at ¶ 29. On December 12, 2018, the FBI made its final release in response to part 2 of plaintiff's request.

The FBI reviewed 232 pages and released 230 pages in full or in part, with certain information withheld by the FBI or OIP pursuant to FOIA Exemptions 5, 7(A), 7(C), and 7(E). Second Hardy Declaration Ex. U. On July 23, 2019, plaintiff was given a combined supplemental release for Part 2 and 3 of his requests. Second Hardy Declaration Ex. V.

The FBI withheld certain information under FOIA exemption 5, relying on the deliberative process privilege, to protect information reflecting the decision making process of the FBI. Second Hardy Declaration ¶ 44.[10] Defendants assert that the records were pre-decisional, preceding investigative and/or prosecutive decisions, and deliberative in that "they played a part in the process by which specific decisions were made about the scope and focus of an investigation." Id.

The FBI asserted Exemption 7(A) to withhold certain responsive information pertaining to an on-going investigation, finding disclosure of the information would interfere with the investigations and potentially reach the individuals who are under investigation. Second Hardy Decl. ¶ 52, Ex. W.

As discussed *supra*, the FBI asserted Exemptions 6 and 7(c) to protect certain personal identifying information of FBI employees as well as third parties. Second Hardy Decl. ¶¶ 53–63. The FBI also asserted Exemption 7(e) regarding information that if released would disclose

---

[10] The FBI asserted Exemption 5's deliberative process privilege regarding Email communications concerning NDAs and interviews conducted by the Office of Special Counsel about FBI Director James Comey's comments announcing the FBI's investigation into Hillary Clinton's use of a personal email server.

The FBI asserted Exemption 5's attorney work product privilege to protect "discussions, contained in various email communications and the OSC interview transcripts . . . concerning materials created by attorneys and communications between attorneys in relation to their representation of their client." Id. at ¶¶ 42, 46.

The FBI asserted attorney client privilege to withhold information between FBI counsel and their client employees regarding legal advice. Id. at ¶ 48.

techniques, guidelines, and procedures for law enforcement investigations or prosecutions. Id. at ¶ 64.[11]

### Plaintiff's October 10, 2017 FOIA Request

On October 10, 2017, plaintiff submitted a four part FOIA request to the NSA. Declaration of Steve E. Thompson ("Thompson Decl.") ¶ 11. Plaintiff requested (1) All documents, records, or communications referencing or containing communications between Seth Rich and any of the following: Julian Assange, Wikileaks, Kim Dotcom, Aaron Rich, Shawn Lucas, Kelsey Mulka, Imran Awan, Abid Awan, Jamal Awan, Hina Alvi, Rao Abbas, and/or any person or entity outside of the United States[.]; (2) All documents or records (including audio recordings) of phone calls made or received by Seth Rich on July 9, 2016 and on July 10, 2016; (3) All documents, records, or communications referencing or containing financial transactions between Seth Rich and any of the following: Julian Assange, Wikileaks, Kim Dotcom, Aaron Rich, Shawn Lucas, Kelsey Mulka, Imran Awan, Abid Awan, Jamal Awan, Hina Alvi, Rao Abbas, and/or any person or entity outside of the United States; and (4) All correspondence received from or sent to any member of Congress (or anyone representing a member of Congress or Congressional committee) regarding Seth Rich, Julian Assange, Wikileaks, Kim Dotcom, Aaron Rich, Shawn Lucas, Kelsey Mulka, Imran Awan, Abid Awan, Jamal Awan, Hina Alvi, and/or Rao Abbas. Id.

The NSA issued a *Glomar* response pursuant to Exemptions 1 and 3 to parts 1–3 of plaintiff's request on November 7, 2017. Thompson Decl. Ex. B. Plaintiff was advised that he could appeal the NSA's decision. Id. Plaintiff did not appeal the NSA's November 17, 2017 decision. After plaintiff filed his complaint on April 13, 2018, the NSA advised plaintiff that part

---

[11] The FBI asserted exemption 7(e) to protect the number of personnel assigned to specific units and divisions; information regarding a specific FBI investigation; as well as the techniques and procedures the FBI used to collect and analyze information in connection with both criminal and national security investigations. Id. at ¶¶ 64–70.

4 of his request had been processed and identified 15 responsive records. Thompson Decl. Ex. E. Those records were withheld in full, also pursuant to Exemptions 1 and 3. Id.

The NSA issued the *Glomar* response after interpreting plaintiff's request to seek intelligence information. Thompson Decl. ¶ 16. Thus, the NSA neither confirmed nor denied the existence of information requested because doing so would reveal whether or not the NSA engaged in certain intelligence activities or did or did not target individual communications for collection. Id. The NSA determined that potentially confirming the existence or nonexistence of records would disclose information that is "currently and properly" classified. Id. at ¶ 18. According to defendants, the information is classified under Section 1.4(c) of Executive Order ("E.O.") 13526, which includes "intelligence activities, intelligence sources and methods, or cryptology" and 1.4(g), which includes "vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans or protection services relating to national security." Id. at ¶ 19. Defendants further allege that confirming the existence or nonexistence of responsive records would disclose information that is classified as Top Secret pursuant to Section 1.2(a)(1) of E.O 13526. Id. at ¶ 20.

Regarding the 15 responsive documents that the NSA withheld in full, defendants state that pursuant to Exemption 1, FOIA does not require release of these documents because they are specifically authorized under E.O. 13526 "to be kept secret in the interest of the national defense or foreign policy or are . . . classified pursuant to such Executive Order." Id. at ¶ 34. Defendants state that the documents that were withheld in accordance with Section 1.4(c) of E.O. 13526 as Top Secret or Secret, and disclosure of these documents would endanger national security. Id. at 35. Defendants further state that all 15 responsive documents are withheld pursuant to FOIA Exemption 3, which does not require disclosure of documents specifically exempted by statute. Id. at ¶ 38. Exemption 3 provides that matters that are specifically exempted from disclosure by statute

are not required to be disclosed under FOIA. See U.S.C. § 552 (b)(3). Defendants state the information here falls within the scope of several statutes, specifically Section 6 of the National Security Agency Act of 1959, 50 U.S.C. § 3605; 18 U.S.C. § 798; and the National Security Act of 1947, as amended by the Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. § 3024. Hardy Decl. ¶ 26–32.

## DISCUSSION

### I. Standard of Review

Where parties cross-move for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001) (citation omitted). "Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Doninger v. Niehoff, 642 F.3d 334, 344 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). A fact is material if it is one that "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (quoting Anderson, 477 U.S. at 248); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). "The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." Pinto v. Allstate Ins. Co., 221 F.3d 394, 398 (2d Cir. 2000); see also Baker v. Home Depot, 445

F.3d 541, 543 (2d Cir. 2006) (resolving all ambiguities and drawing all inferences in favor of the non-moving party on summary judgment).

However, the non-moving party must provide "affirmative evidence" from which a jury could return a verdict in its favor. Anderson, 477 U.S. at 257. "Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003) (quoting Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998)). Moreover, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." Id. (quoting Anderson, 477 U.S. at 252).

## II.    The Freedom of Information Act

"FOIA was enacted to facilitate public access to Government documents and was designed to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." Associated Press v. U.S. Dep't of Def., 554 F.3d 274, 283 (2d Cir. 2009) (internal citations and quotation omitted); see also U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 773 (1989) (The "basic policy" of FOIA "focuses on the citizens' right to be informed about 'what their government is up to.'"). FOIA requires that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . . shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3)(A). "FOIA strongly favors a policy of disclosure and requires the government to disclose its records unless its documents fall within one of the specific, enumerated exemptions set forth in the Act." Nat'l Council of La Raza v. DOJ, 411 F.3d 350, 355 (2d Cir. 2005) (citations omitted).

"Summary judgment is the preferred procedural vehicle for resolving FOIA disputes." Adamowicz v. IRS, 552 F. Supp. 2d 355, 361 (S.D.N.Y. 2008). "In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA." Carney v. U.S. Dep't Justice, 19 F.3d 807, 812 (2d Cir. 1994); see also Ruotolo v. Dep't of Justice, Tax Div., 53 F.3d 4, 9 (2d Cir. 1995) ("[T]o prevail on a summary judgment motion in a FOIA case, an agency must demonstrate that each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the Act's inspection requirements."). "FOIA specifies that a district court must conduct a *de novo* review of an agency's claim to exemptions." Lee v. Fed. Deposit Ins. Corp., 923 F. Supp. 451, 453 (S.D.N.Y. 1996). Consistent with its purpose, "FOIA exemptions are to be construed narrowly, resolving all doubts in favor of disclosure, and the government bears the burden of establishing that any claimed exemption applies." N.Y. Times Co. v. U.S. Dep't of Justice, 756 F.3d 100, 112 (2d Cir. 2014), opinion amended on denial of reh'g, 758 F.3d 436 (2d Cir. 2014), supplemented, 762 F.3d 233 (2d Cir. 2014) (citing Wilner v. Nat'l Sec. Agency, 592 F.3d 60, 69 (2d Cir. 2009)). Furthermore, in the national security context, courts "'must accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record.'" Am. Civil Liberties Union v. Dep't of Justice, 681 F.3d 61, 69 (2d Cir. 2012) (citing Wolf v. CIA, 473 F.3d 370, 374 (D.C. Cir. 2007))

Agency affidavits, however, must describe with reasonable specificity the nature of the documents at issue and the justification for nondisclosure; conclusory assertions are insufficient. Bloomberg L.P. v. Bd. of Governors of Fed. Reserve Sys., 649 F. Supp. 2d 262, 270 (S.D.N.Y. 2009), aff'd sub nom. Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys., 601 F.3d 143

(2d Cir. 2010) (citing Halpern v. F.B.I., 181 F.3d 279, 291 (2d Cir. 1999)). For example, here, the NSA has invoked a *Glomar* response.[12] Thus, the agency must "tether its refusal [to confirm the existence or nonexistence of documents] to one of the nine FOIA exemptions . . . if the FOIA exemption would itself preclude the acknowledgment of such documents." Wilner, 592 F.3d at 71 (internal citation and quotations omitted).

In sum, the district court can award summary judgment on the basis of agency affidavits, Carney, 19 F.3d at 812 (citing Goland v. CIA, 607 F.2d 339, 352 (D.C. Cir. 1978), cert. denied, 445 U.S. 927 (1980)), so long as the affidavits "[1] describe the justifications for nondisclosure with reasonably specific detail, [2] demonstrate that the information withheld logically falls within the claimed exemption, and [3] are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." Wilner, 592 F.3d at 73.

### A. The Adequacy of the FBI's Search for Records Concerning Seth Conrad Rich

The crux of plaintiff's complaint is the adequacy of the FBI's responses to his request for records regarding Seth Conrad Rich. On September 1, 2017, plaintiff submitted a FOIA request to the FBI seeking the opportunity to view "all records and correspondence pertaining to Seth Conrad Rich, who was murdered in the District of Columbia on or about July 10 2016." Hardy Decl. Ex. A. On September 19, 2017, the FBI responded to plaintiff's FOIA request, stating "[b]ased on the information you provided, we conducted a search of the Central Records System. We were unable to identify main file records responsive to FOIA."

---

[12] The *Glomar* doctrine has its origins in a 1976 case before the United States Court of Appeals for the District of Columbia, Phillippi v. CIA, 546 F.2d 1009 (D.C. Cir. 1976). An agency issues a *Glomar* response when it refuses to confirm or deny the existence of responsive records on the ground that even to acknowledge the records' existence itself would cause the harm underlying a FOIA exception. See Gardels v. CIA, 689 F.2d 1100, 1102–03 (D.C. Cir. 1982); Wolf, 473 F.3d at 374.

To prevail on a summary judgment motion in a FOIA case, the defending agency bears the burden of establishing the adequacy of its search, and it may satisfy this burden by submitting "[a]ffidavits or declarations supplying facts indicating that the agency has conducted a thorough search[.]" Long v. Office of Pers. Mgmt., 692 F.3d 185, 190–91 (2d Cir. 2012) (quoting Carney, 19 F.3d at 812). "Under this standard, the relevant question 'is not whether there might exist any other documents possibly responsive to the request, but rather whether the search for those documents was adequate' under the particular circumstances of the case." Bloomgarden v. U.S. Dep't of Justice, 10 F. Supp. 3d 146, 152 (D.D.C. 2014) (quoting Weisberg v. U.S. Dept. of Justice, 745 F.2d 1476, 1485 (D.C. Cir. 1984)).

"[A]gency affidavits must show that the agency made a good faith effort to search for the requested documents, using methods 'reasonably calculated' to produce documents responsive to the FOIA request." Seife v. U.S. Dep't of State, 298 F. Supp. 3d 592, 607 (S.D.N.Y. 2018) (quoting Garcia, 181 F. Supp. 2d at 366). "[A]n agency's search need not be perfect, but rather need only be reasonable." Grand Cent. P'ship v. Cuomo, 166 F.3d 473, 489 (2d Cir. 1999) (citation and internal quotation marks omitted). Thus, "[t]he adequacy of a search is not measured by its results, but rather by its method," and thus, "a search is not inadequate" because it does not identify the entire universe of responsive records. N.Y. Times Co. v. U.S. Dep't of Justice, 756 F.3d at 123–24; see also, e.g., Oglesby v. U.S. Dep't of Army, 920 F.2d 57, 68 (D.C. Cir. 1990) ("A reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched, is necessary to afford a FOIA requester an opportunity to challenge the adequacy of the search and to allow the district court to determine if the search was adequate in order to grant summary judgment."); Nat'l Immigration Project of the Nat. Lawyers Guild v. U.S. Dep't of Homeland Sec.,

No. 11 Civ. 3235, 2012 WL 6809301, at *4 (S.D.N.Y. Dec. 27, 2012) ("An agency's affidavits or declarations should set forth the search terms and the type of search performed....[and must] supply more than glib government assertions of complete disclosure or retrieval.") (citations and internal quotation marks omitted).

The FBI submits David M. Hardy's declaration to substantiate the adequacy of its search. See Hardy Decl. RIDS conducted an index search of CRS for responsive records employing the Universal Index application of Automated Case Support. The FBI conducted a three-way search using the name "Seth Conrad Rich." Hardy Decl. ¶ 19. No responsive main or reference records were located. Id. at ¶ 20. The FBI also searched its Sentinel index using the same original search, and the Sentinel search found no responsive main or record files. Hardy Decl. ¶ 20. RIDS conducted the CRS index searches because they encompass information about "individuals, organizations, events and other subjects of investigative interest for future retrieval," and given the nature of plaintiff's request, if they existed, such records would be reasonably expected to be located in the CRS. Hardy decl. ¶ 21. The FBI also contacted the WFO twice, and confirmed that the WFO did not open an investigation into Seth Rich's murder. Hardy Decl. ¶¶ 22–23.

Plaintiff states that the FBI should have conducted a search of the WFO's "emails, texts, etc.," its Computer Analysis and Response Team ("CART"), and their "Electronic Surveillance Indices ("ELSUR") database[.]" Pl.'s Mem. of Law at 3–5. Plaintiff attaches the Declaration of Edward Butowsky [13]("Butowsky Decl."). Butowsky declares that he spoke with a friend who "worked in a high-level intelligence position for the Executive Branch," and that friend "personally

---

[13] Plaintiff represents Butowsky in another pending lawsuit, Butowsky v. Folkenflik, et al., Case No. 4:18-CV-00442 (E.D.Tex.).

viewed records" that were downloaded from Seth Rich's computer to the FBI's CART. Butowsky Decl. 1–2.[14]

The FBI has established that the search it conducted was "reasonably calculated" to locate responsive documents. <u>Seife</u>, 298 F.Supp.3d at 607. The Hardy Declaration describes the structures of CRS and Sentinel, and describes the FBI's search to locate responsive records. <u>See Nolen v. Dep't of Justice</u>, 146 F. Supp. 3d 89, 97 (D.D.C. 2015) ("[A] search is generally adequate where the agency has sufficiently explained its search process and why the specified record systems are not reasonably likely to contain responsive records." (citation omitted)). While plaintiff argues that the FBI should have searched WFO emails or texts as well as CART, the FBI's declaration establishes that their searches did not locate any CART records. Hardy Decl. n. 6.[15] Moreover, Hardy'states that WFO emails regarding Seth Rich that had investigative significance would have been logged into the CRS system, and thus would have been located in the FBI's search. <u>Id.</u> at ¶ 24.[16]

---

[14] On March 29, 2020, plaintiff filed a notice, advising the Court that on March 9, 2020, in the Butowsky case, plaintiff deposed former Assistant United States Attorney, Deborah Sines, who was assigned to the Seth Rich matter. ECF No. 57. Plaintiff alleges that Ms. Sines confirmed at the deposition that the FBI examined Seth Rich's computer and further testified that the FBI "should have" email communications regarding the examination of Seth Rich's computer. <u>Id.</u>

[15] The information presented in Butowsky's declaration is hearsay. Plaintiff argues that Courts have permitted hearsay in FOIA cases; however, the Butowsky declaration is wholly insufficient. The Court has no information as to what position Butowsky's "friend" held, when that "friend" held the position, or what the "friend" personally viewed regarding Seth Rich's records. <u>See Barnard v. Dep't of Homeland Sec.</u>, 598 F. Supp. 2d 1, 19 (D.D.C. 2009) ("FOIA declarants may include statements in their declarations based on information they have obtained in the course of their official duties."). The declaration here provides no information regarding Butowsky's friend's official duties or whether he obtained "personal knowledge" of the alleged records during the course of his official duties.

[16] Plaintiff suggests that the FBI, specifically Hardy, has acted in bad faith. Plaintiff's cross-motion for summary judgment as well as his most recent March 29, 2020 filing do little to advance plaintiff's bad faith claim. Even if there were responsive CART records or WFO records that were not identified in the FBI's search, the fact that the initial searches did not locate these documents does not support a finding of bad faith, as the FBI is not required to locate every responsive document in existence in order for a search to be considered reasonable. <u>Conti v. U.S. Dep't of Homeland Sec.</u>, No. 12 CV 5827, 2014 WL 1274517, at *15 (S.D.N.Y. Mar. 24, 2014) ("[M]any courts have rejected the argument that the discovery of additional documents or later discovery of missing files renders a search unreasonable or conducted in bad faith."); <u>Taggart v. Office of the Inspector Gen.</u>, No. 10 Civ. 5447, 2011 WL 13128214 (S.D.N.Y. Sept. 22, 2011), <u>aff'd sub nom. Taggart v. Office of Inspector Gen. (OIG)</u>, 530 F. App'x 17 (2d Cir. 2013), at *8 ("[A] reviewing court must consider 'whether the search was reasonably calculated to discover the requested documents, not whether it actually uncovered every document extant.'") (quoting <u>Grand Cent. P'Ship</u>, 166

Additionally, plaintiff contends that the FBI should have searched their "Electronic Surveillance Indices ("ELSUR") database," however, the FBI need not probe every data base that may have responsive records, rather the FBI must "show that its search efforts were reasonable and logically organized to uncover relevant documents; it need not knock down every search design advanced by every requester." DiBacco v. U.S. Army, 795 F.3d 178, 191 (D.C. Cir. 2015) (citing SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1201 (D.C. Cir. 1991)); see also Liberation Newspaper v. U.S. Dep't of State, 80 F. Supp. 3d 137, 146-47 (D.D.C. 2015) ("Where the search terms are reasonably calculated to lead to responsive documents, the Court should not 'micro manage' the agency's search.") (citing Johnson v. Exec. Office for U.S. Attorneys, 310 F.3d 771, 776 (D.C. Cir. 2002). Accordingly, the Court grants defendants' motion for summary judgment as to plaintiff's FOIA claim challenging the adequacy of the FBI's search regarding his September 1, 2017 FOIA request. Plaintiff's cross-motion for summary judgment on this claim is denied.

## B. The FBI, Criminal Division, and NSD's Response to Plaintiff's March 1, 2017 FOIA Request

The FBI, the Criminal Division, and the NSD asserted exemptions 6 and 7(c) regarding plaintiff's March 1, 2017 FOIA request that identified six categories of records primarily in relation to the investigation of Hillary Rodham Clinton's emails. Brodfuehrer Decl. ¶ 7, 18; Tiernan Decl. ¶ 6. Defendants argue that the requested information, individuals' names and other identifying information, falls within the two FOIA exemptions. Defs.' Mem. of Law ¶ 10–11. The Court agrees.

Exemption 6 permits federal agencies to withhold from disclosure "personnel and medical files and similar files" where the disclosure of the information "would constitute a clearly

---

F.3d at 489). In any event, other than plaintiff's conclusory statements, there is no record evidence that the FBI has acted in bad faith in this matter.

unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). "Exemption 6 is intended to 'protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information.'" Wood v. FBI, 432 F.3d 78, 86 (2d Cir. 2005) (quoting U.S. Dep't of State v. Washington Post Co., 456 U.S. 595, 599 (1982)). Exemption 6 requires a two-step inquiry: "[f]irst, we must determine whether the personal information is contained in a file similar to a medical or personnel file," and, second, "we balance the public's need for the information against the individual's privacy interest to determine whether the disclosure . . . would constitute a 'clearly unwarranted invasion of privacy.'" Wood, 432 F.3d at 86 (quoting 5 U.S.C. § 552[b][6]). This Exemption covers a broad range of files, including "the government's 'records on an individual which can be identified as applying to that individual.'" Associated Press, 554 F.3d at 291 (quoting Washington Post Co., 456 at 600–02). In assessing the existence of a privacy interest under this exemption, the focus is on what the requested information reveals, not what it might lead to. Associated Press, 554 F.3d at 292.

Exemption 6 places a heavier burden on the government than Exemption 7(C) when it seeks to withhold certain information. FOIA Exemption 7(C) permits the withholding of "records or information compiled for law enforcement purposes" when production of such records or information "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).

The contours of the privacy interest protected by Exemption 6 and Exemption 7(C) are the same for the purposes of the Court's analysis. Associated Press, 554 F.3d at 284 n.9, 291. "[S]uch privacy interests include 'the individual interest in avoiding disclosure of personal matters' as well as 'the interest in independence in making certain kinds of important decisions,'" and encompasses both "'the individual's control of information concerning his or her person'" and "'keeping

personal facts away from the public eye.'" <u>Associated Press</u>, 554 F.3d at 284 (quoting <u>Reporters Comm.</u>, 489 U.S. at 762–63. The Second Circuit has noted that "there is little public interest in having the identities of private parties revealed because that information sheds little or no light on the [agency's] performance," and that, similarly, "the public interest in identifying law enforcement personnel is small [if] that information sheds little light on the conduct and administration of [agency] investigations." <u>Halpern</u>, 181 F.3d at 297 (finding that disclosure of identities was not warranted because the plaintiff did not allege any specific wrongdoing by the agency that might implicate the need for public disclosure of those identities).

The Criminal Division withheld the email address, telephone and cell phone numbers and other personal information of Assistant Attorney General Leslie Caldwell; the names and email addresses of attorneys from the National Security Division ("NSD"); the name, email address, and telephone number of a Criminal Division administrative employee; the cell phone number of an attorney from a private law firm; and the phone number of a Washington Post reporter; Defs.' 56.1 Statement ¶ 6–7; Brodfeuhrer Decl. ¶ 18. The NSD withheld the name and identifying information of NSD attorneys authoring emails within the chain; Tiernan Decl. ¶ 9. Finally, the FBI withheld the identifying information, email addresses, and personal cellular telephone numbers of FBI Special Agents and professional staff responsible for receiving, reviewing, analyzing, supervising, conducting and/or maintaining the investigation activities and the day to day operation of the FBI, as well as the name and identifying information of non-federal government employees and third parties identified in the responsive records. Defs.' 56.1 Statement ¶ 17; Second Hardy Decl. ¶ 56–63.

The Court finds that this information was properly withheld pursuant to Exemptions 6 and 7(c). As previously noted, Exemption 6 requires a two step inquiry. The first step of the inquiry is

"not a difficult hurdle to clear, as the Second Circuit considers 'a record . . . [is] a "similar file" if it contains personal information identifiable to a particular person.'" <u>Osen LLC v. United States Cent. Command</u>, 375 F. Supp. 3d 409, 423 (S.D.N.Y. 2019) (quoting <u>Cook v. Nat'l Archives & Records Admin.</u>, 758 F.3d 168, 175 (2d Cir. 2014)); <u>see also</u> <u>Washington Post</u>, 456 U.S. at 602 ("[T]he exemption was intended to cover detailed Government records on an individual which can be identified as applying to that individual.") (citations omitted). Here, the records at issue are a similar file as they contain personal identifying information particular to several individuals, including the telephone number, email addresses, and/or other identifying information of Assistant Attorney General Leslie Caldwell, a Criminal Division administrative employee, NSD Attorneys, FBI Agents and staff, private attorney Beth Wilkinson, and third parties. It matters not that the withheld records provide only a modicum of personal information. As the Second Circuit noted in <u>Wood</u>, "although the files may not contain personal information about a particular witness beyond his or her name and identifying information such as a job title, the disclosure of a witness's identity would be subject to the Exemption 6 balancing test. <u>Wood</u>, 432 F.3d at 86. Thus, the Court finds that the withheld records are a similar file and thus subject to the Exemption 6 balancing test.

As to the second inquiry, "[t]he balancing analysis for FOIA Exemption 6 requires that [the court] first determine whether disclosure of the files would compromise a substantial, as opposed to a *de minimis*, privacy interest, because if no substantial privacy interest is implicated FOIA demands disclosure." <u>Seife</u>, 366 F. Supp. 3d at 610 (quoting <u>Cook</u>, 758 F.3d at 175–76). However, "[t]he privacy interests protected by the exemptions to FOIA are broadly construed." <u>Associated Press v. U.S. Dep't of Justice,</u> 549 F.3d 62, 65 (2d Cir. 2008). "Personal information, including a citizen's name, address, and criminal history, has been found to implicate a privacy interest cognizable under the FOIA exemptions." <u>Id.</u>

Here, the request for individuals' identifying information, such as their names, personal cellular numbers, and email addresses certainly implicate a privacy interest, and the Court finds that disclosure of the information would not advance "the core purpose of the FOIA." The Supreme Court has held that the core purpose of FOIA is to inform the public on Government agencies' performance of their missions and how they conduct operations or activities. Plaintiff fails to demonstrate how disclosure of this personal identifying information would advance the core purpose of FOIA. Moreover, plaintiff fails to cite any evidence that would establish that disclosure "would serve a public interest cognizable under the FOIA." In fact, plaintiff's Memorandum of Law wholly fails to address his March 7, 2017 request. See Pls.' Mem. of Law. Thus, the Court finds that defendants properly asserted Exemption 6 to withhold the requested information. As the Court has determined that the information was properly withheld pursuant to Exemption 6, the Court need not address Exemption 7(c). Although multiple exemptions can protect a single document in the FOIA context, the Court need not make redundant findings to justify non-disclosure. See Pinson v. Dep't of Justice, 236 F. Supp. 3d 338, 346 n.4 (D.D.C. 2017); Appleton v. Food & Drug Admin., 451 F. Supp. 2d 129, 141 (D.D.C. 2006) ("[I]f the defendants have withheld information on the basis of multiple exemptions, the court need only rely on one exemption for each piece of exempted material." (citing Kanter v. Dep't of State, 479 F. Supp. 921, 928 n.9 (D.D.C. 1979))).

### C. The FBI's Response to Plaintiff's October 1, 2017 Request

Plaintiff submitted a three-part FOIA request to the FBI on October 1, 2017 regarding a letter Senator Charles Grassley sent to FBI Director Christopher Wray concerning a non-disclosure agreement ("NDA") between the FBI and the Office of Special Counsel. Second Hardy Decl. Ex. H. Defendants assert that part 1 of plaintiff's October 1, 2017 request was not a proper FOIA

request. On December 12, 2018, the FBI made its final release in response to part 2 of plaintiff's request. The FBI reviewed 232 pages and released 230 pages in full or in part, with certain information withheld by the FBI or OIP pursuant to FOIA Exemptions 5, 7(A), 7(C), and 7(E). Second Hardy Declaration Ex. U. On November 9, 2018, the FBI advised plaintiff regarding part 3 of plaintiff's request; it reviewed 50 pages and released 42 to plaintiff in part, with information withheld pursuant to Exemptions 5, 6, 7(c) and 7(E).

      *i.     Exhaustion of Administrative Remedies for Part 1 of Plaintiff's Request*

On March 13, 2018, the FBI advised plaintiff that part 1 of his request was not a proper FOIA request. Id. at ¶ 22. The FBI stated that plaintiff's request was overbroad, vague, and lacked sufficient detail for agency personnel to locate records. Second Hardy Decl. Ex. N. The FBI further advised plaintiff that should he resubmit his request, he should submit a narrower and more detailed request that would enable personnel to locate the records. Id. Plaintiff appealed the FBI's decision concerning the NDAs, stating "-[i]t is not possible to suggest that the FBI Office of General Counsel is unable to search for non-disclosure agreements that it executed with other agencies, and it should not matter whether the documents are logged into the "Central Records System." Second Hardy Decl. Ex. O.

A proper FOIA request must "(i) reasonably describe[ ] such records[.]" 5 U.S.C. § 552(a)(3) (A). "A record is 'reasonably described if a professional employee of the agency familiar with the subject matter can locate the records with a reasonable amount of effort.'" Roman v. CIA, No. 11 CV 5944, 2013 WL 210224, at *6 (quoting Freedom Watch, Inc. v. C.I.A, 895 F. Supp. 2d 221, 228 (D.D.C. 2012)). The FBI regulations require a description of requested documents that include "enough detail to enable Department personnel to locate them with a reasonable amount of effort." 28 C.F.R. § 16.3(b). The regulation further states that where possible, the request "should include

specific information about each record sought, such as the date, title or name, author, recipient, and subject matter of the record."

"The plaintiff is considered to have failed to exhaust [his] administrative remedies" if he failed to make a proper FOIA request pursuant to the agency's regulations. Roman, 2013 WL 210224, at *6 (citing Vest v. Dep't of Air Force, 793 F. Supp. 2d 103, 114 (D.D.C. 2011); McKevitt v. Mueller, 689 F. Supp. 2d 661, 667 (S.D.N.Y. 2010)).

Plaintiff argues that "the real issue here is that the FBI did not want to conduct a reasonable search, because the results of that search might be embarrassing." Pl.'s Mem. of Law at 5. Defendants posit that because plaintiff's request was vague and overbroad, the FBI could not conduct a search that was reasonably calculated to locate records responsive to plaintiff's request. Defs.' Mem. of Law at 24. Plaintiff was advised he could revise his request to the FBI's standards, but plaintiff chose to file an appeal instead. Id.

The Court agrees that part 1 of plaintiff's October 1, 2017 request to the FBI was overbroad. Plaintiff was directed he could revise his request to meet the FBI's standards in accordance with 16 C.F.R. 16.3(b). "An agency need not honor a [FOIA] request that requires an unreasonably burdensome search. The rationale for this rule is that FOIA was not intended to reduce government agencies to full-time investigators on behalf of requestors." Freedom Watch, 895 F. Supp. 2d at 228 (internal citations and quotation marks omitted). As noted *supra*, if the plaintiff fails to comply with the agency's regulations for making a proper FOIA request, the plaintiff is considered to have failed to exhaust his administrative remedies, and the complaint must be dismissed. See Vest, 793 F. Supp. 2d at 114 (granting summary judgment to defendant when plaintiff failed to comply with agency's FOIA regulations because "[f]ailure to comply with an agency's FOIA regulations for filing a proper FOIA request is the equivalent of a failure to exhaust" (internal citation and

quotation marks omitted)); see also McKevitt, 689 F. Supp. 2d at 667 (stating that a plaintiff cannot sue an agency in federal court when she has failed to comply with the agency's FOIA regulations).

Part 1 of plaintiff's request here sought "all NDAs between the FBI and any other government entity that prohibit the release of information to congress, any of its agencies, or any Freedom of Information Act requestors." This request is not specific, detailed or narrow in any sense. The overbroad request would not enable the agency to locate responsive records with a "reasonable amount of effort." See Dale v. IRS, 238 F. Supp. 2d 99, 105 (D.D.C. 2002) (dismissing complaint where FOIA requester's "all-encompassing fishing expedition" failed to comply with agency regulations requiring the request to "reasonably describe the information requested"). Plaintiff's request for "All NDAs" between the "FBI and any other government entity" provides no specific scope, such as the date, title, name, author, or recipient of the record. Based on plaintiff's refusal to revise his request, he failed to comply with the FBI's FOIA regulations, and thus he is considered to have failed to exhaust his administrative remedies. Therefore, defendants' motion for summary judgment on part 1 of plaintiff's October 1, 2017 request to the FBI is granted.

ii. *Exemptions 7(A) and 7(E)*

Part 2 of plaintiff's October 1, 2017 request sought all records, documents, correspondence, or other materials sent to Senator Grassley or his representatives in response to his September 25, 2017 letter. In response, the FBI withheld information, stating that it pertained to an ongoing investigation asserting Exemptions 7(A) and 7(E). The FBI declared that disclosure of the information would interfere with ongoing investigations and would potentially reach individuals under investigation. The requested information would also disclose techniques, guidelines, and procedures for law enforcement investigations or prosecutions, including the number of personnel assigned to specific units and divisions, disclose information regarding a specific FBI

investigation, and disclose techniques and procedures the FBI used to collect and analyze information in connection with both criminal and national security investigations. Second Hardy Decl. ¶ 52, Ex. W; Second Hardy Decl. ¶¶ 64–70.

Exemption 7(A) applies to "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). Under Exemption (7((E), Courts have "set[ ] a relatively low bar for [an] agency to justify withholding". <u>Blackwell v. Fed. Bureau of Investigation</u>, 646 F.3d 37, 42 (D.C. Cir. 2011). Exemption (7)(E) exempts from disclosure: records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law. . . . 5 U.S.C. § 552(b)(7)(E).

Here, defendants' declaration states that release of the requested information could potentially allow investigated individuals to evade law enforcement and would allow criminals to assess the FBI's strengths and weaknesses as well as their resources. Second Hardy Decl. ¶¶ 52, 64–70. The withheld information included techniques, guidelines, and procedures for investigations and prosecutions and thus has a "rational nexus to the agency's law-enforcement duties." <u>Bishop v. U.S. Dep't of Homeland Sec.</u>, 45 F. Supp. 3d 380, 387 (S.D.N.Y. 2014). Therefore, the withheld information was compiled for law enforcement purposes. The disclosure of the requested information could reasonably "be expected to cause some articulable harm" to pending enforcement proceedings. <u>Azmy v. U.S. Dep't of Def.</u>, 562 F. Supp. 2d 590, 605

(S.D.N.Y. 2008). Defendants have satisfied their burden of justifying that the information's nondisclosure was proper pursuant to Exemptions 7(A) and 7(E). See, e.g., Amnesty Int'l USA v. CIA, 728 F. Supp. 2d 526–27 (S.D.N.Y. 2010) (holding that the government's explanation that disclosure of withheld information would, *inter alia*, alert subjects of CIA investigations was sufficient to invoke Exemption 7(A)).

  *iii.*  *Exemption 5*

   The FBI asserted Exemption 5 to withhold eight pages of responsive email communications in their entirety regarding NDAs between the FBI and the EOUSA Office of General Counsel ("OGC") and transcripts of interviews of two FBI employees conducted by the Office of Special Counsel regarding announcements made by former FBI Director James Comey concerning the FBI's investigation of Hillary Clinton's use of a personal email server. Defs.' 56.1 Statement ¶¶ 49–50.

   Exemption 5 exempts from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The privilege is based "on the policy of protecting the decision making processes of government agencies." Brennan Ctr. for Justice at New York Univ. Sch. of Law v. U.S. Dep't of Justice, 697 F.3d 184, 194 (2d Cir. 2012) (quoting NLRB v. Sears, Roebuck, & Co., 421 U.S. 132, 150 (1975)). Exemption 5 incorporates three common law privileges, the attorney-client privilege, the deliberative process privilege, and the attorney work product privilege. La Raza, 411 F.3d at 356 (2d Cir. 2005); see also NLRB., 421 U.S. at 154 ("It is equally clear that Congress had the attorney's work-product privilege specifically in mind when it adopted Exemption 5 . . . .").

*a. Deliberative Process Privilege*

Defendants contend that the documents concerning emails regarding the drafting process and internal deliberations of NDAs, and Office of Special Counsel interview transcripts of two FBI employees, Trisha Anderson and James Rybicki, were properly withheld under Exemption 5. Second Hardy Decl. ¶ 40. "The deliberative process privilege is designed to promote the quality of agency decisions by preserving and encouraging candid discussion between officials." La Raza, 411 F.3d at 356; see also Wolfe v. Dep't of Health & Human Servs., 839 F.2d 768, 773 (D.C. Cir. 1988) ("Congress adopted Exemption 5 because it recognized that the quality of administrative decision-making would be seriously undermined if agencies were forced to operate in a fishbowl." (citation omitted.)). Brennan Ctr. for Justice, 697 F.3d at 194. "An inter- or intra-agency document may be withheld pursuant to the deliberative process privilege if it is: (1) "predecisional," that is "prepared in order to assist an agency decisionmaker in arriving at his decision," and (2) "deliberative," i.e., "actually ... related to the process by which policies are formulated." Id. (quotation omitted).

The Court finds that defendants properly asserted Exemption 5 to withhold these documents. Defendants declare that the email communications regarding NDAs were drafts which included language such as "thank you for the opportunity to review," "I worked from the current draft…then I propose instead of the following language (with differences in red text)[.]" Second Hardy Decl. ¶ 41. Defendants further posit that the subject line on most of the emails read "NDA language…" Id. Defendants conclude that given the language of the emails, the emails are pre-decisional and deliberative. Id. Moreover, defendants assert OSC interview transcripts concerning allegations that FBI Director James Comey violated the Hatch Act by commenting on Hillary Clinton's use of a personal email server are subject to the deliberative process privilege. Second

Hardy Decl. ¶ 42. Defendants argue that disclosure of this information would reveal "pre-decisional formulation of opinions" and would have "an inhibiting effect on agency decision making and development of policy." Defs.' Mem. of Law at 29—30. Defendants also state that disclosure of the interview transcripts would reveal the agency's decision making process regarding the FBI employee who was being interviewed. Defs.' 56.1 Statement at 51.

Again, the Court finds defendants properly withheld these documents under Exemption 5. It is well-settled that draft documents, by their very nature, are typically pre-decisional and deliberative. "They reflect only the tentative view of their authors; views that might be altered or rejected upon further deliberation by their authors or by their superiors." Amnesty Int'l USA, 728 F. Supp. 2d at 518 (citation omitted); Nat'l Council of La Raza v. Dep't of Justice, 339 F. Supp. 2d 572, 583 (S.D.N.Y. 2004) ("Drafts and comments on documents are quintessentially predecisional and deliberative."); NAACP Legal Def. & Educ. Fund, Inc. v. U.S. Dep't of Hous. & Urban Dev., 2007 WL 4233008, at *11 (S.D.N.Y. Nov. 30, 2007) (same). These emails reflect the initial process regarding the drafting of NDAs, including comments made on proposed draft language of the NDAs. See Nat. Res. Def. Council v. United States Envtl. Prot. Agency, No. 19-2896, 2020 WL 1541968, at *4 (2d Cir. Apr. 1, 2020) (recognizing that an agency record is "deliberative if it reflects the give-and-take of the consultative process[]") (quoting Brennan Ctr. for Justice, 697 F.3d at 202). These emails were therefore pre-decisional in that they reflect preliminary discussions regarding the formulation of the NDAs. Release of these emails would give the public insight into the collaborative process through which agencies make their decisions, which ultimately "might mislead the public as to [the agency's] reasoning, which it is entitled to keep private in the spirit of free discussion in the policy-making process." Robert v. Dep't of

Health & Human Servs., No. 01 CV 4778, 2005 WL 1861755, at *1 (E.D.N.Y. Aug. 1, 2005), aff'd, 217 F. App'x 50 (2d Cir. 2007).

Moreover, the OCS transcripts were properly withheld in that they included pre-decisional and deliberative conversations that could lead to final decisions by the agency. See also N.Y. Times Co. v. U.S. Dep't of Defense, 499 F. Supp. 2d 501, 515 (S.D.N.Y. 2007) (email was predecisional and deliberative as it "comment[ed] on a draft ... paper and raise[d] a possible issue to be considered") (citation and marks omitted); La Raza, 339 F. Supp. 2d at 584 (email exchange regarding draft was protected as it showed "comments produced and exchanged before a final [document] is released"); cf. MacNamara v. City of N.Y., 249 F.R.D. 70, 85 (S.D.N.Y. 2008) (ordering production of emails concerning "routine operating decisions rather than policy oriented judgments") (marks and alterations omitted). As the emails and transcript were deliberative in nature, they were properly withheld pursuant to Exemption 5's deliberative process privilege. Therefore, defendants' motion for summary judgment regarding part 2 of plaintiff's October 1, 2017 FOIA request is granted.

   *b. Attorney-Client Privilege*

Defendants also assert the attorney-client privilege regarding portions of information contained in the OSC's May 2017 transcript of interviews of FBI employees where the information revealed discussions between the interviewees and counsel "in preparation for the OSC's interviews and confidential discussions between the interviewees and legal counsel during the FBI's investigation into former secretary Hillary Clinton's use of a personal email server." Second Hardy Decl. ¶ 47. The privilege protects "communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." United States v. Mejia, 655 F.3d 126, 132 (2d Cir. 2011);

see also Brennan Ctr. for Justice, 697 F.3d at 207. In the context of legal advice to government officials, "the privilege furthers a culture in which consultation with government lawyers is accepted as a normal, desirable, and even indispensable part of conducting public business. Abrogating the privilege undermines that culture and thereby impairs the public interest." In re Grand Jury Investigation, 399 F.3d 527, 534 (2d Cir. 2005). The Second Circuit has explained that "[t]he public interest in ensuring that government officials receive sound legal advice is at its apex when the programs about which advice is sought are secret and unlikely to be subject to litigation. In such cases, the frank exchange between government officials and their attorneys serves as a crucial—and maybe the only—safeguard in ensuring the legality of government action." Am. Civil Liberties Union v. Nat'l Sec. Agency, 925 F.3d 576, 589 (2d Cir. 2019).

Here, defendants asserted the attorney-client privilege to protect discussions in the interview transcripts between FBI counsel and FBI client employees and also to protect emails between the EOUSA OGC and the FBI describing opinions and suggestions related to language in the NDA. Second Hardy Decl. ¶¶ 46–48, 75. The Court accords defendants' declarations a presumption of good faith, and in the absence of any contrary evidence presented by plaintiff, the Court grants defendants' motion for summary judgment regarding the transcripts and emails that were withheld pursuant to the attorney-client privilege. See Carney, 19 F.3d at 812.

  c.  *Work Product Privilege*

Defendants assert the attorney work product privilege to "protect discussions, contained in various email communications and the OSC interview transcripts of Anderson and Rybicki, concerning materials created by attorneys and communications between attorneys in relation to their representation of their client." Second Hardy Decl. ¶ 46. Defendants cite Ex. W, Bates-

stamped page 8.[17] Plaintiff further asserts the attorney work product privilege to protect "information gleaned from attorney-supplied materials in support of the FBI's investigation into former Secretary Hillary Clinton's use of a personal email server. Id. Defendants cite Ex. W, Bates-stamped pages 177–179.

The work product privilege is governed by Federal Rule of Civil Procedure 26(b)(3), which prohibits a party from discovering from its adversary any "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative," absent a showing of substantial need. Not only are an attorney's mental impressions and opinions about a case prohibited from discovery, but also the results of the attorney's factual investigations in anticipation of the case may constitute attorney work product. Fed. R. Civ. P. 26(b)(3)(B).

The work product of government attorneys is entitled to the same protection as that of private lawyers. NLRB, 421 U.S. at 154. A lawyer to a government agency, like a lawyer to any private litigant, must "assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy." Hickman v. Taylor, 329 U.S. 495, 511 (1947). Forcing agencies to disclose this work product in response to FOIA requests would render it impossible for agency staff to effectively perform their jobs.

Plaintiff does not dispute that the email communications or the information gleaned from the attorney supplied materials were attorney work product at the time they were drafted. Based on defendants' declaration, the Court finds that the communications are exempt from disclosure.

---

[17] Defendants provide a Vaughn index that details the Exemptions invoked to specific Bates-numbered documents. In Vaughn v. Rosen, the Court of Appeals for the D.C. Circuit held that in order to assure "that allegations of exempt status are adequately justified . . . courts will simply no longer accept conclusory and generalized allegations of exemptions . . . but will require a relatively detailed analysis in manageable segments." 484 F.2d 820, 826 (D.C. Cir. 1973). Thus, when invoking a FOIA exemption, agencies submit a "Vaughn index"—a list of withheld documents and claimed exemptions—and a "Vaughn affidavit," describing the documents and the agency's rationale for that withholding. Seife, 298 F. Supp. 3d at 606.

Accordingly, defendants' motion for summary judgment regarding parts 2 and 3 of plaintiff's October 1, 2017 FOIA request is granted.

### D. The NSA's Response to plaintiff's October 10, 2017 FOIA Request

*1. Exemption 1*

On October 10, 2017, plaintiff sent a four part FOIA request to the NSA. Declaration of Steve E. Thompson ("Thompson Decl.) ¶ 11. Plaintiff requested (1) All documents, records, or communications referencing or containing communications between Seth Rich and several individuals; (2) All documents or records (including audio recordings) of phone calls made or received by Seth Rich on July 9, 2016 and on July 10 2016; (3) All documents, records, or communications referencing or containing financial transactions between Seth Rich and several individuals; and (4) all correspondence received from or sent to any member of Congress (or anyone representing a member of Congress or Congressional committee) regarding Seth Rich and several other individuals. Id. The NSA issued a *Glomar* response to parts 1–3 of plaintiff's request on November 7, 2017 pursuant to FOIA Exemptions 1 and 3, Thompson Decl. Ex. B, and on April 13, 2018, the NSA advised plaintiff that part 4 of his request had been processed and identified 15 responsive records, which were withheld in full pursuant to Exemptions (b)(1) and (b)(3). Thompson Decl. Ex. E.

The NSA's *Glomar* response must be tethered to a FOIA exemption to be upheld—so long as the agency has proffered one legitimate basis for its *Glomar* response, defendants are entitled to summary judgment. Wilner, 592 F.3d at 71–72. Here, the NSA provides its *Glomar* response to FOIA Exemption 1, the classified national security information exemption, 5 U.S.C. § 552(b)(1), and Exemption 3, the information protected by federal statute exemption. 5 U.S.C. § 552(b)(3).

The Court holds that Exemption 1 and/or Exemption 3 are sufficient to grant defendants' motion for summary.

The Government may withhold records under Exemption 1 if the records are "(A) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive Order." 5 U.S.C. § 552(b)(1).

Under Exemption 1, defendants rely on E.O. 13526, which lays out the four requirements for classification of information in the interest of national defense or foreign policy: (1) that an "original classification authority" must classify the information; (2) that the information must be "owned by or produced by or for, or is under the control of the United States Government;" (3) that "the information falls within one or more of eight protected categories listed in section 1.4," of EO 13526 which include "intelligence activities (including covert action) ... or methods," and "foreign activities of the United States;" and (4) that the original classification authority "determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security" and be "able to identify or describe the damage." EO 13526 §§ 1.1(a)(1)–(4) to 1.4. EO 13526 also authorizes agencies to provide a *Glomar* response where appropriate: "An agency may refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified under this order or its predecessors." Id. at § 3.6(a).

To satisfy its burden on summary judgment, the Government must establish through affidavits "that it complied with proper procedures in classifying materials and that the withheld information falls within the substantive scope" of a particular Executive Order. Amnesty Int'l USA, 728 F. Supp. 2d at 506 (citing Salisbury v. United States, 690 F.2d 966, 971–72 (D.C. Cir.

1982)). These affidavits must "contain sufficient detail to forge the logical connection between the information [withheld] and [Exemption 1]." Id. (alterations in original) (quoting <u>Physicians for Human Rights v. U.S. Dep't of Def.</u>, 675 F. Supp. 2d 149, 166 (D.D.C. 2009)). However, "the Court is 'mindful that issues of national security are within the unique purview of the executive branches, and that as a practical matter, few judges have the skill or experience to weigh the repercussions of disclosure of intelligence information.'" Id. (quoting <u>Physicians for Human Rights</u>, 675 F. Supp. 2d at 166). Accordingly, the Court gives deference to the Government's justifications for classifying information. Id.

Defendants submit a declaration by Steven E. Thompson, Chief of Policy, Information, Performance, and Exports at the NSA. <u>See</u> Thompson Decl. The Court finds that the Thompson declaration demonstrates the requested information falls under exemption 1. Defendants declare that "confirming the nonexistence or existence" of responsive records would disclose information that is "currently and properly" classified "TOP SECRET." Thompson Decl. ¶ 20. Defendants further declare that confirming the "existence or nonexistence" of records regarding certain individuals who may be subject to surveillance "would provide our adversaries with critical information about the capabilities and limitations of NSA[.]" Id. at ¶ 21. Therefore, Thompson concludes that the "fact of the existence or nonexistence of intelligence information is properly classified . . . in accordance with E.O. 13526[.]" Thompson Decl. ¶ 25. Given the high degree of deference to which an agency is entitled regarding classification, the Court finds that the Thompson declaration is sufficient to justify defendants' *Glomar* response pursuant to FOIA

Exemption 1 regarding parts 1–3 of plaintiff's request.[18] Accordingly, defendants' motion for summary judgment regarding parts 1 through 3 of plaintiff's FOIA request to the NSA is granted.

*2. Exemption 3*

Regarding part 4 of plaintiff's request, defendants withheld 15 responsive documents in full pursuant to FOIA Exemptions 1 and 3. The Court discussed *supra* the law regarding FOIA Exemption 1. However, under FOIA Exemption 3, the Government is permitted to withhold information that is "specifically exempted from disclosure by [a] statute" that requires certain information to be withheld or that establishes criteria for the withholding of information. 5 U.S.C. § 552(b)(3). The Court's assessment of the applicability of this exemption "depends less on the detailed factual contents of specific documents" than with other FOIA exemptions; rather, "the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within that statute's coverage." Amnesty Int'l USA, 728 F. Supp. 2d at 501 (quoting Goland, 607 F.2d at 350.

In CIA v. Sims, 471 U.S. 159 (1985), the Supreme Court established a two-part framework for reviewing an agency's invocation of Exemption 3: First, the Court must consider whether the statute identified by the agency is a statute of exemption as contemplated by Exemption 3. Second, the Court must consider whether the withheld material satisfies the criteria of the exemption statute. Id. at 167; see Fitzgibbon v. C.I.A., 911 F.2d 755, 761 (D.C. Cir. 1990).

Defendants invoke three statutes to justify nondisclosure of the 15 responsive documents under Exemption 3: Section 6 of the National Security Agency Act of 1959, 50 U.S.C. § 3605, which exempts from disclosure "the organization or any function of the [NSA], or any information with

---

[18] As the Court finds that defendants have properly asserted a *Glomar* response to parts 1–3 of plaintiff's request pursuant to FOIA Exemption 1, the Court need not consider defendants' assertion of FOIA Exemption 3 to this portion of plaintiff's request.

respect to the activities thereof"; 50 U.S.C. § 3024(i)(1), which directs the director of national intelligence to "protect intelligence sources and methods from unauthorized disclosure" and to "establish and implement guidelines for the intelligence community" regarding the classification and dissemination of sensitive information; 18 U.S.C. § 798, which criminalizes the unauthorized disclosure of classified information, *inter alia*, "concerning the communication intelligence activities of the United States" or "obtained by the processes of communication intelligence from the communications of any foreign government". The Court need only consider Section 6 here, as it is sufficient to sustain defendants' *Glomar* response and nondisclosure of the 15 withheld responsive documents.

"Section 6 states that no law shall be construed to require the disclosure of any information with respect to the activities of the NSA." Wilner, 592 F.3d at 73 (citations omitted). "As to the first prong of the Sims framework, it is well-established that FOIA Exemption 3 properly encompasses Section 6 of the NSAA." Roman v. Nat'l Sec. Agency, No. 07 Civ. 4502, 2009 WL 303686, at *5 (E.D.N.Y. Feb. 9, 2009), aff'd 354 Fed. Appx. 591 (2d Cir. 2009). Indeed, the Second Circuit found in Wilner that "the language of Section 6 makes quite clear that it falls within the scope of Exemption 3.") Wilner, 592 F.3d at 72. Regarding the second prong—whether the withheld information falls within the ambit of the statute— defendants rely on the Thompson declaration, describing that "the withheld documents concern NSA's involvement in intelligence activities" and "compromise communications between Congress and NSA relating to classified intelligence matters[.]"

While "[a]n agency must show not only that the requested records would be exempt from disclosure, but also that the FOIA exemption would itself preclude the acknowledgement [even confirming or deny the existence] of such documents," Wilner, 592 F.3d at 75, "Congress's broad

language in section 6 of the NSAA eases that burden for the agency, as it exempts from disclosure any 'information with respect to the activities' of that agency." Id. As the Second Circuit explained:

> Confirming or denying the mere existence of specific records in a general surveillance program would logically be both confirming or denying that the NSA was targeting a specific individual and confirming or denying that the NSA is conducting a general surveillance program. Either disclosure would be information with respect to the activities" of the NSA and therefore exempt under FOIA.

Id. While the statute should not be read so broadly as to exempt the NSA entirely from FOIA, see, e.g., Am. Civil Liberties Union v. Office of the Dir. of Nat. Intelligence, No. 10 Civ. 4419, 2011 WL 5563520, at *9–10 (S.D.N.Y. Nov. 15, 2011), the core of plaintiff's request, as established by the Thompson declaration, would require any response to reveal 'information with respect to the activities' of the NSA." Wilner, 592 F.3d at 75 (emphasis in original). Thus, defendants' motion for summary judgment regarding the NSA's withholding 15 responsive documents to part 4 of plaintiff's FOIA request is granted.

### E. Segregability

FOIA imposes certain limits on Exemption 5. Specifically, "any reasonably segregable portion of a record" must be disclosed "after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b). Thus, "memoranda consisting only of compiled factual material or purely factual material contained in deliberative memoranda and severable from its context would generally be available for discovery." Envtl. Prot. Agency v. Mink, 410 U.S. 73, 87–88 (1973); see also Grand Cent. P'ship, 166 F.3d at 482 (Exemption 5 does not encompass purely factual matters)). However, factual observations "inextricably intertwined" with the privileged opinions and recommendations within a deliberative memoranda are non-segregable and are exempt from disclosure. Hopkins v. U.S. Dep't of Housing & Urban Development, 929 F.2d 81,

85 (2d Cir. 1991) (citing <u>Mink</u>, 410 U.S. at 92; <u>Lead Indus. Ass'n v. OSHA</u>, 610 F.2d 70, 85 (2d Cir.1979)).

Under FOIA, any "reasonably segregable" information in a responsive record must be released, 5 U.S.C. § 552(b), and "non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions," <u>Mead Data Cent., Inc. v. U.S. Dep't of Air Force</u>, 566 F.2d 242, 260 (D.C. Cir. 1977). By contrast, "information that is 'inextricably intertwined' with exempt information cannot be disclosed." <u>Inner City Press/Cmty. on the Move v. Bd. of Governors of the Fed. Reserve Sys.</u>, 463 F.3d 239, 249 n.10 (2d Cir. 2006) (citation omitted). "Before approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld." <u>Sussman v. U.S. Marshals Serv.</u>, 494 F.3d 1106, 1116 (D.C. Cir. 2007). "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." <u>Id.</u> at 1117.

Here, defendants maintain that to the extent requested information was segregable, it has been disclosed. <u>See</u> Defs.' 56.1 Statement ¶ 48; Thompson Decl. ¶ 35; Tiernan Decl. ¶ 10; Brodfuehrer Decl. ¶ 22. Courts often rely on the parties' declarations in FOIA litigation, which are entitled to a presumption of good faith absent a showing to the contrary. <u>See</u>, <u>e.g.</u>, <u>Am. Civil Liberties Union v. Dep't of Justice</u>, 210 F. Supp. 3d 467, 483 (S.D.N.Y. 2016); <u>Sussman</u>, 494 F.3d at 1117 (observing that "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material," which must be overcome by some "quantum of evidence" by the plaintiff). Plaintiff fails to rebut defendants' declarations. The Court finds that defendants have adequately demonstrated that no additional, segregable information remains to be disclosed.

## CONCLUSION

Accordingly, for the foregoing reasons, defendants' motion for summary judgment is granted, and plaintiff's motion for partial summary judgment is denied. The Clerk of Court shall enter judgment and close this case.

SO ORDERED.

_____/S/_____
LOIS BLOOM
United States Magistrate Judge

Dated: April 3, 2020
      Brooklyn, New York